**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CASE NO: 2:21CR22-LGW-BWC** |
| | ) | |
| **V.** | ) | |
| | ) | |
| **GREGORY McMICHAEL,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**SENTENCING MEMORANDUM**

COMES NOW GREGORY McMICHAEL,[1] Defendant herein, by and through his attorney of record, and provides the Court with this, his Sentencing Memorandum.  The purpose of this Memorandum is to provide additional information about this case relevant to the Court's sentencing decision, to present additional relevant information to the Court about Greg McMichael himself, and to make specific recommendations regarding the sentence to be imposed.

Greg McMichael initially raised various objections to the Presentence Investigation Report ("PSR"), but those matters have been resolved, leaving no outstanding objections.  Accordingly, Greg McMichael concurs that the U.S. Sentencing Guidelines provide for a sentence of Life imprisonment, plus seven years, to be served consecutively.  Nevertheless, Greg McMichael respectfully requests that this Honorable Court vary from the Guidelines sentence based upon the factors

---

[1] To avoid confusion with Mr. McMichael's son and codefendant, Travis McMichael, the Defendant shall be referred to as "Greg McMichael" throughout this Memorandum.

contained in 18 U.S.C. § 3553(a) and for the following specific reasons which will be more thoroughly discussed in this Memorandum:

- To ensure the physical safety of Greg McMichael by not sending him to a state prison system whose very operation may enable inmates to engage in dangerous and even deadly activities;
- To avoid significant sentencing disparity with individuals convicted of like offenses whose culpable conduct far exceeded that of Greg McMichael; and
- To properly account for the concerns of Greg McMichael's significant healthcare needs, including his advanced age, poor cardiac condition, previous stroke, and bouts of depression and anxiety.

## I. Factual Background – The Offense

1.

On February 22, 2022, a jury convicted Greg McMichael of three counts related to the shooting death of Ahmaud Arbery ("Mr. Arbery"), including Count 1, Interference with Rights, a violation of 18 U.S.C. § 245(b)(2)(B); Count 3, Attempted Kidnapping, a violation of 18 U.S.C. § 1201(a)(1) and (d); and Count 5, Using, Carrying, and Brandishing a Firearm in Relation to a Crime of Violence, a violation of 18 U.S.C. § 924(c).

2.

Two years earlier, on February 23, 2020, Greg McMichael was repairing boat cushions in his driveway located in the Satilla Shores subdivision of Brunswick,

United States v. Gregory McMichael
Case No.: 2:21CR22-LGW-BWC
Sentencing Memorandum

Georgia, when he observed Mr. Arbery running on the street at a high rate of speed. PSR, ¶8, 27.  Greg McMichael recognized Mr. Arbery as an individual who had been witnessed and recorded walking through a house under construction multiple times in the preceding months without the permission of the homeowner.  PSR, ¶8, 27.

<div align="center">3.</div>

Greg McMichael also understood Mr. Arbery to be the same individual that his son, Travis McMichael, encountered in the neighborhood on February 11, 2020, again outside of the house under construction. PSR, ¶7.  According to Travis McMichael, he confronted Mr. Arbery the night of February 11, and Mr. Arbery furtively reached into his pocket in a manner that caused Travis to fear that Mr. Arbery was armed. PSR, ¶18.  Travis McMichael retreated to his vehicle and returned home. PSR, ¶18. He told his father about the incident and reported the matter to police that evening. PSR, ¶18.

<div align="center">4.</div>

Also a few weeks prior to the shooting, on or about January 31, 2020, Travis McMichael had reported to police that a pistol was stolen from his truck while parked in the driveway of his home on Satilla Drive. PSR, ¶17.  Both Travis and Greg McMichael asserted to law enforcement in interviews after Mr. Arbery's death that they believed there had been several break-ins and thefts in the area in the six to seven months preceding the shooting.  PSR ¶17, 28.

<div align="center">3 of 33</div>

5.

After witnessing Mr. Arbery sprint past his home on February 23, 2020, Greg Michael bounded into his house and told his son, "C'mon, let's go!" PSR, ¶8. Concerned that Mr. Arbery might be armed based upon Travis McMichael's encounter on February 11, Greg McMichael grabbed his police-issued .357 magnum pistol, and Travis McMichael took a Remington shotgun. PSR, ¶12, 29.

6.

The McMichaels piled into Travis McMichael's pick-up truck, with Travis at the wheel. PSR, ¶ 29. Greg McMichael initially sat in the front passenger seat, but it was a difficult task because his grandson's child car seat was already installed in the cab of the truck. PSR, ¶30.

7.

The McMichaels pursued Mr. Arbery through the Satilla Shores neighborhood, Travis attempting unsuccessfully to speak to him. PSR, ¶20. During the pursuit, Travis McMichael drove his truck ahead of Mr. Arbery to cut him off. PSR, ¶29. The McMichaels exited the truck and instructed Mr. Arbery to stop, but he (Mr. Arbery) turned and ran in the other direction. PSR, ¶29. The McMichaels reentered the vehicle, this time with Greg McMichael taking position in the bed of the truck to avoid the child's car seat, and drove down another street in the neighborhood. PSR, ¶30.

8.

Again, the McMichaels got to a position ahead of Mr. Arbery for the purpose of cutting him off. PSR, ¶23.  Travis McMichael exited the truck with his shotgun as Mr. Arbery ran toward the truck from the rear, eventually passing it on the passenger side. PSR, ¶22, 23.  At this moment, Greg McMichael was on the phone with 911 after calling from Travis McMichael's cell phone, which had been previously dropped on the floorboard of the truck. PSR, ¶21, 22.

9.

As Mr. Arbery ran past the truck on the passenger side, Greg McMichael shouted at him to stop. PSR, ¶30, 31.  After passing the vehicle, Mr. Arbery turned to the left, running toward Travis McMichael, who was holding the Remington shotgun at the ready. PSR, ¶30.  Mr. Arbery grabbed at the barrel of Travis McMichael's shotgun. PSR, ¶11.  Travis McMichael discharged the shotgun, striking Mr. Arbery in the chest and the right wrist. PSR, ¶11.  Mr. Arbery still struggled for possession of the shotgun, and Travis McMichael fired two more shots, the third striking Mr. Arbery again in the chest. PSR, ¶11.  Mr. Arbery stumbled a few steps before falling to the pavement, where he died. PSR, ¶11.

10.

During Travis McMichael and Mr. Arbery's brief struggle for the shotgun, Greg McMichael exited the bed of the truck, drawing his pistol.  By the time Greg

United States v. Gregory McMichael
Case No.: 2:21CR22-LGW-BWC
Sentencing Memorandum

McMichael closed the distance, Mr. Arbery was already dead.   Greg McMichael partially rolled Mr. Arbery's still body over to check for a weapon, but there was none. PSR, ¶ 13.

11.

Portions of the encounter, as well as the shooting itself, were filmed by neighbor William Roddie Bryan, who, in his own pick-up truck, attempted to block Mr. Arbery's travel. PSR, ¶32.  Bryan did not communicate with the McMichaels at all during the pursuit and acted independently.

12.

Following the shooting, Greg McMichael consented to law enforcement interviews at the scene as well as the police station, answering each question put to him. PSR, ¶12, 17.

13.

Greg McMichael stood trial and was convicted by a jury in the Glynn County Superior Court on charges of Felony Murder, Aggravated Assault, False Imprisonment, and Criminal Attempt to Commit a Felony, all related to the shooting death of Mr. Arbery. PSR, ¶82.  On January 7, 2022, Greg McMichael received a sentence of Life Without Parole, plus 20 years of confinement consecutive to the Life sentence. PSR, ¶82.

14.

Greg McMichael has been in continuous custody for 27 months, ever since being arrested on May 7, 2020.  He has been in the custody of U.S. Marshals since May 11, 2021 and remains incarcerated at the Glynn County Detention Center.

15.

In advance of his federal trial, Greg McMichael negotiated in good faith a plea agreement with the Government.  The terms of that plea would have required Greg McMichael to plead guilty to the Interference of Rights charge, the gravamen of the Government's case against him, and waive all appeals of his federal sentence. Additionally, Greg McMichael would have accepted a sentence of 30 years (360 months).  In return for his plea of guilty, the Government promised to request that that the Georgia Department of Corrections relinquish primary custody of Greg McMichael so that he would serve his 30-year sentence in a federal correctional institution before being transferred to state custody to complete the balance of his life sentence.

16.

The date of the scheduled plea was January 31, 2022.  After being informed by this Court that his negotiated plea for a 30-year sentence would not be accepted, Greg McMichael, along with his son Travis and neighbor William Roddie Bryan, were tried

United States v. Gregory McMichael
Case No.: 2:21CR22-LGW-BWC
Sentencing Memorandum

in the U.S. District Court for the Southern District of Georgia.  After deliberations, the jury returned guilty verdicts for all three men on February 22, 2022.

## II. Factual Background – The Person

17.

Greg McMichael is 66 years old.  He has been married to the same woman, Allison "Leigh" McMichael, for 39 years.  They have two children, Travis, 36, and Lindsay, 32.  Other than a short term of service in the U.S. Navy, from 1975 until his honorable discharge in 1977, and a brief time spent in Florida after leaving the Navy, Greg McMichael has resided in Brunswick, Georgia all his life.



18.

While serving in the Navy, Greg McMichael distinguished himself by saving the life of a shipmate who was drowning in the Bay of Cadiz in southwestern Spain. For his efforts, Vice Admiral Harry D. Train, II, Commander of the Sixth Fleet, awarded Greg McMichael with a letter of commendation for his selfless and heroic

efforts.  The shipmate whose life was saved by Greg McMichael was African American.



19.

Greg McMichael served in law enforcement in two separate periods.  From 1982 to 1989, he was employed by the Glynn County Police Department as a patrol officer, detective, and a narcotics officer.  After leaving the police force, he worked in sales for approximately five years before being hired by the Glynn County District

Attorney's Office in 1995, where he would serve as a Chief Investigator until his retirement in 2019. In total, Greg McMichael served as either a police officer or investigator for 31 years.

<div align="center">20.</div>

Over his three decades of law enforcement service, during which Greg McMichael would encounter criminal suspects, witnesses, police officers, members of the community, and others, he never received any complaints in his personnel file for racism, harassment, or police brutality. Moreover, there has never been any record of Greg McMichael creating or perpetuating a hostile work environment.[2]

<div align="center">21.</div>

During his tenure as a detective in the Glynn County Police Department, Greg McMichael was recognized for his skillful and effective interaction with Carol Sanders Beatty, a 27-year-old real estate appraiser who was victimized in a home invasion on St. Simons Island in May 1986. The *Brunswick News* documented Greg McMichael's ingenious attempt to learn the name of Ms. Beatty's attacker as she lay in her hospital bed, unable to speak from the brutal attack.

> McMichael, at the time a Glynn County detective, was called to Mrs. Beatty's bedside in the emergency room at the Brunswick hospital.

---

[2] A victim's relative testified at the federal trial that, some 5 years before Mr. Arbery's death, Greg McMichael used racially insensitive language and expressed satisfaction at the passing of civil rights leader Julian Bond. Greg McMichael disputes the witness's recollection and denies making those statements. There was no contemporaneous complaint ever lodged by this person, and the allegation remains largely uncorroborated.

<div align="center">10 of 33</div>

One of the things that stays with me, I could read her lips and she was saying, "Help me. Help me. Oh God, help me," McMichael said.



Mrs. Beatty also tried to tell McMichael the name of her attacker, but couldn't vocalize the information because her throat had been cut. McMichael picked up the first name, "Bob," by reading her lips but couldn't understand the last name she was saying.

"I tried to get her to write but she had defense wounds on her hands so she couldn't write," McMichael said.

Then McMichael put his hand in hers and told her he was going to recite the letters of the alphabet. McMichael asked her to stop him on the letters that spelled her attacker's name by squeezing his hand.

McMichael went through the alphabet again and again and Mrs. Beatty spelled N-E-W-L-A. At that point, McMichael had enough to spell Bob's last name—Newland.

He lived across the street from Mrs. Beatty and her young daughter. It was there that police found Newland asleep in his bed after the attack, McMichael said. Newland had washed his bloody clothes and hidden his soiled tennis shoes behind the washing machine.

While police left to arrest their suspect, Mrs. Beatty was taken to the operating room. McMichael went with her.

"I was the last person she talked to on this earth and to this day, I'm still haunted by it," he said.

Amy Horton, *The Brunswick News,* (last visited July 18, 2022) https://thebrunswicknews.com/news/local_news/nice-guy-gets-results-dealing-with-crooks/article_256422ca-d071-5b3d-93b0-97b2fce29eb7.html

22.

Greg McMichael balanced his work responsibilities with being the quintessential family man and enjoyed spending time with his wife and children.

 



12 of 33

23.

Greg McMichael also treasured the valuable bond he had with his only grandchild.  He enjoyed spending time with him and deeply regrets that he will likely observe him grow up only from afar.

 



13 of 33

24.

Any discussion of Greg McMichael as a person cannot be completed without addressing the seriousness and history of his medical ailments.  He suffered a stroke approximately six years ago, which led to the implanting of a monitor on his heart to catalog fibrillation.  Prior to being incarcerated in 2020, Greg McMichael used a small device the size of a phone to receive data from this monitor.  Since his arrest in May 2020, this regular monitoring has been impossible, thus raising the danger that fibrillation can occur undetected, increasing the risk of a cardiac event.

25.

Twelve years ago, Greg McMichael first received a stent because of blockage in an artery; two years later, the process had to be repeated because the artery was again clogged.  In May 2022, Greg McMichael experienced severe edema and swelling of his feet, ankles, and lower legs as well as shortness of breath.  Given the seriousness of his medical history, Greg McMichael requested an appointment with his cardiologist.  In mid-July 2022, he met with the cardiologist, who informed him that he observed 90% occlusion in an artery.  Following an angioplasty procedure, Greg McMichael was informed that the occlusion was reduced to 50%.  His symptoms

have improved considerably; however, he still experiences some swelling and occasional shortness of breath.[3]

26.

For a considerable portion of his adult life, Greg McMichael has also battled depression and anxiety, officially being diagnosed with major depression at age 46. Medical records confirmed that Greg McMichael treated his mental health condition from 1998 until 2003 and 2010 to 2020 with counseling and medication. PSR, ¶94.

27.

While incarcerated at the Glynn County Detention Center, Greg McMichael has received the following medications: Toprol XL (high blood pressure and heart disease); Prilosec (heartburn); Repatha (heart and stroke); aspirin (blood thinner); clonazepam (panic disorder); and Wellbutrin (depression). PSR, ¶93, 94.

28.

### III.  Determining a Sentence Generally After Booker

Section 3553(a) has been described in U.S. v. Booker, 543 U.S. 220 (2005), and much post-Booker case law as containing various "factors"—one of which is the United States Sentencing Guidelines and the guideline range calculated pursuant to them—which must now be considered in determining an appropriate sentence.

---

[3] Greg McMichael's cardiac condition is even more concerning because of his family history.  James McMichael, Greg's father, passed away in 1964, at the young age of 51 of a cardiac event.

United States v. Gregory McMichael
Case No.: 2:21CR22-LGW-BWC
Sentencing Memorandum

Section 3553(a) is actually comprised of two distinct parts: the so-called "sentencing mandate" contained in the prefatory clause of § 3553(a), and the "factors" to be considered in fulfilling that mandate.   The sentencing mandate is an overriding principle that limits the sentence a court may impose.

<div align="center">29.</div>

## A. The § 3553(a) Sentencing Mandate: The "Parsimony Provision"

The basic mandate and overriding principle of § 3553(a) requires a district court to impose a sentence "sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in § 3553:

> (a) retribution (to reflect seriousness of the offense, to promote respect for the law, and to provide "just punishment");
>
> (b) deterrence;
>
> (c) incapacitation (to protect the public from further crimes); and
>
> (d) rehabilitation (to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner). 18 U.S.C. § 3553(a)(2).

<div align="center">30.</div>

The   "sufficient-but-not-greater-than-necessary"   requirement   has   been described as the "parsimony provision." Bifulco v. United States, 447 U.S. 381, 387

<div align="center">16 of 33</div>

(1980) (explaining that statutory construction "rule of lenity" applies to sentencing statutes as well as to substantive criminal offense statutes).

<div align="center">31.</div>

The parsimony provision is not just another "factor" to be considered along with the others set forth in § 3553(a). Rather, the provision sets an independent upper limit on the sentence a court may impose.

<div align="center">32.</div>

## B. The § 3553(a) Factors to be Considered in Complying with the Sentencing Mandate

In determining what sentence is sufficient but not greater than necessary to comply with the § 3553(a)(2) purposes of sentencing, a court must consider several factors listed in § 3553(a). Those factors are (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the kinds of sentence available;" (3) the guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) guideline range; (4) the need to avoid unwarranted sentencing disparity; and (5) the need to provide restitution where applicable. 18 U.S.C. § 3553(a)(1), (a)(3), (a)(5)-(7). Neither the statute itself, nor Booker suggests that any one of these factors is to be given greater weight than any other factor. However, what is clear is that all of these factors are subservient to § 3553(a)'s mandate to impose a sentence not greater than necessary to comply with the four purposes of sentencing.

<div align="center">17 of 33</div>

33.

Once the court correctly calculates the advisory sentencing range, "it may impose a more severe or more lenient sentence as long as it is reasonable." <u>United States v. Pope,</u> 461 F.3 1331, 1336-37 (11th Cir. 2006).

34.

The effect of the Sentencing Guidelines was further limited in <u>Rita v. United States,</u> 551 U.S. 338, 350-351 (2007), when the Supreme Court held that a court of appeals may apply a presumption of reasonableness to a district court sentence imposed within a properly calculated guideline range.  Critically, however, the Court said that such a presumption does not apply in the district court.  Therefore, a defendant may argue for a non-Guidelines sentence (1) on the basis of traditional departure grounds, (2) "because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations," or (3) "because a case warrants a different sentence regardless." <u>Id.</u> at 351.  "In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." <u>Id.</u>

35.

## C.  Application of the Factors to the Case.

1. <u>Nature and Circumstances of the Offense.</u>  Mr. Arbery's death was a tragedy that could have been easily avoided by the defendants.  Mr.  Arbery was unarmed

and presented no threat when Greg McMichael observed him sprinting down Satilla Drive. The evidence adduced at both state and federal trials confirms that Mr. Arbery had nothing in his hands and had taken nothing from the home under construction. If a person were suspicious of Mr. Arbery's presence, a prudent action might have been to simply notify police; a more adventurous course would have been to follow Mr. Arbery—from a safe and non-threatening distance—to relay his location to law enforcement. Greg McMichael instead chose to enlist his son and engage in armed self-help by not only pursuing Mr. Arbery but also demanding that he stop, and when that failed, impeding his movement.

<div align="center">36.</div>

Despite the obvious error in judgment, it is nevertheless important to highlight the nature and scope of Greg McMichael's individual actions on that day. First, Greg McMichael did not draw his weapon until an actual struggle between Travis McMichael and Mr. Arbery erupted over the shotgun. Second, there is no evidence that Greg McMichael ever pointed his pistol at Mr. Arbery during the pursuit. Even as Mr. Arbery passed Greg McMichael on the right side of the truck, Greg McMichael did not draw his weapon and instead merely yelled at Mr. Arbery to stop. Finally, it is Travis McMichael, not Greg, who is the direct and proximate cause of Mr. Arbery's death.

<div align="center">19 of 33</div>

37.

The evidence also supports the contention that Greg McMichael initiated the pursuit of Mr. Arbery because he recognized him as the individual who had impermissibly entered the home under construction on at least four occasions. It was also Greg McMichael's subjective and honest belief that Mr. Arbery was the individual responsible for stealing boat electronics and equipment from that same home. Even if he held this belief in error—there is no evidence linking Mr. Arbery to any actual thefts in Satilla Shores—the fact remains that Greg McMichael did not set out to harass Mr. Arbery merely because he was a person of color running on Satilla Drive. In fact, evidence adduced at trial confirmed that Greg McMichael had previously rented property to persons of color, undermining any theory that Greg McMichael harbored antipathy towards African Americans for simply running down his street.

38.

2. <u>History and Characteristics of the Defendant.</u>   Greg McMichael is a Category I defendant with no criminal history. He served the United States for two years while in the Navy. He served the community of Brunswick for over 30 years as a member of law enforcement. In both arenas, he received recognition and commendations for exemplary performance. He heroically saved the life of an African American shipmate while in the Navy, and he assisted in the identification and arrest

of a murderer under unique and challenging circumstances. Greg McMichael's lifetime of public service can and should stand for something when it comes to sentencing; it cannot be simply discounted as if it had never occurred.

<p style="text-align:center">39.</p>

Greg McMichael is 66 years old with a history of stroke and heart disease. He has been diagnosed with major depression and anxiety for over 20 years. His myriad of medical conditions warrants close observation and accessibility to suitable healthcare. He is also a former law enforcement officer who has been convicted of a hate crime resulting in the death of a young African American man, all of which has been reported worldwide. Those factors implicate personal safety concerns at whatever penal facility he is assigned. In other words, Greg McMichael will most assuredly be a target for violence because of his prior profession and his offense.[4]

<p style="text-align:center">40.</p>

3. <u>The Kinds of Sentence Available.</u>   Clearly the offenses to which Greg McMichael has been found guilty warrant a substantial period of incarceration; that is not being contested in this Memorandum. To ensure the physical safety of Greg McMichael, however, he should not be sent to a state prison system whose very operation may enable inmates to engage in dangerous and even deadly activity.

---

[4] Indeed, there have been uncorroborated reports of threats against both McMichaels for when they enter the Georgia prison system.

<p style="text-align:center">21 of 33</p>

<u>United States v. Gregory McMichael</u>
Case No.: 2:21CR22-LGW-BWC
Sentencing Memorandum

Indeed, his safety should be of particular concern to the United States and this Honorable Court.  "Ensuring the inherent human dignity and worth of everyone, including people who are incarcerated inside our nation's jails and prisons, is a top priority," said Assistant Attorney General Kristen Clarke of the Justice Department's Civil Rights Division. *Justice Department Announces Investigation into Conditions in Georgia Prisons*, Dep't of Justice Press Release, September 14, 2021 (hereinafter "DOJ Press Release").  Assistant Attorney General Clark made this statement when she announced a Department of Justice investigation into conditions of confinement of prisoners held in Georgia prisons, an investigation that is still ongoing.

41.

The U.S. Attorneys for the three federal districts in Georgia each commented on the importance of this investigation into the conditions of Georgia prisons.  Acting U.S. Attorney Kurt R. Erskine for the Northern District of Georgia articulated, "Individuals sentenced to prison in Georgia Department of Corrections facilities deserve to be treated humanely." DOJ Press Release.  Operations that allow inmates to "engage in dangerous and even deadly activity are an injustice," warned Acting U.S. Attorney Peter D. Leary of the Middle District of Georgia. DOJ Press Release.

42.

Striking a cooperative and constructive tone at the announcement of the investigation, U.S. Attorney David H. Estes of the Southern District of Georgia—the

very office that prosecuted Greg McMichael—explained, "We look forward to working with the State of Georgia, the Georgia Department of Corrections, the Civil Rights Division of the Department of Justice, and our counterparts in the U.S. Attorney's Offices for the Northern and Middle districts of Georgia to further our shared mission to keep correctional facilities safe  . . ." DOJ Press Release.

43.

Despite the optimistic attitude from the Southern District, the State of Georgia has been reluctant to cooperate fully, refusing to answer subpoenas propounded by the federal government.  In a petition filed on March 28, 2022 in district court in Atlanta, the Department of Justice asked that a judge direct the Georgia Department of Corrections to "drop a series of demands for releasing the documents, including a requirement that the Department of Justice sign a nondisclosure agreement." Danny Robbins, *DOJ says State Impeding Investigation of Prison Violence*, ATLANTA JOURNAL-CONST., April 2, 2022.  The same article also reported, "The [Georgia Department of Corrections] is also denying the [Department of Justice] access to prisons for site visits or interviews with inmates or prison staff unless it signs an NDA [nondisclosure agreement]." Id.  Such apparently obstructive behavior runs contrary to any hoped-for optimism and perhaps indicates a consciousness of guilt or liability regarding the underlying claims.

44.

The Department of Justice began its broad investigation into a Georgia state prison system that has been "plagued by extreme staffing shortages and a culture of violence and neglect in which at least 44 inmates have died by homicide [in 2020]." Kevin Johnson, *Justice Department Investigating Georgia State Prisons after 44 Inmate Deaths, LGBT Assaults,* USA TODAY, Sept. 14, 2021.  In a separate federal civil rights lawsuit, the Southern Center for Human Rights claimed that 70% of the 300 people held in solitary confinement at Georgia State Prison suffered from serious mental illness. Middleton v. Ward, Case No. 5:21CV33, *1 (M.D. Ga. 2021).[5] According to the verified complaint, the inmates were "kept in conditions so harsh and isolating—and they receive such inadequate mental health care—that self-injury, violence, and suicide are common." Id. at 1.

45.

The Georgia prison system has a long and troubled history with civil rights violations. Guthrie v. Evans, 93 F.R.D. 390, 391-392 (S.D. Ga. 1981) (approving a settlement of inmates' class action under § 1983 arising out of an unconstitutional disciplinary system and making the terms of the settlement the order of the court). In approving the class action settlement, the court recognized that the underlying

---

[5] It should be noted that on February 2, 2022, the parties in Middleton filed a joint motion to stay proceedings to confirm that Georgia State Prison was closing. On March 8, 2022, the parties stipulated to a dismissal of the complaint without prejudice.

United States v. Gregory McMichael
Case No.: 2:21CR22-LGW-BWC
Sentencing Memorandum

case was first filed in 1972 and "covered the gamut typical of these cases: substandard environmental conditions; inadequate medical and psychiatric care; unconstitutional disciplinary practices; summary punishments and guard brutality; failure to protect from harm; racial discrimination in work assignments, imposition of discipline, and other prison practices; racially motivated verbal abuse; infringements on the rights of Muslim inmates; inadequate law library; lack of educational and vocational activities; interference with correspondence; etc." Id. at 391-392.[6]  For these same reasons, this Court should retain custody of Greg McMichael, at least until the current investigation into the conditions of Georgia prisons is concluded by the Department of Justice and Greg McMichael's safety can be reasonably assured.

46.

4. Avoid Sentencing Disparity.  A variance in sentencing is warranted in this case to avoid significant disparity with similarly convicted individuals whose culpable conduct far exceeded that of Greg McMichael.  District courts are required "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6); see United States v. Docampo, 573 F.3d 1091, 1101 (11th Cir. 2009).  "A well-founded claim of disparity, however, assumes that apples are being compared to apples." Id. at 1101 (quoting

---

[6] It is perhaps not merely coincidence that this sentencing proceeding is taking place in a courtroom dedicated to the jurist who penned the ruling in Guthrie and made overseeing the conditions of Georgia prisons, and the care of the inmates confined therein, such an enduring part of his legacy.

United States v. Gregory McMichael
Case No.: 2:21CR22-LGW-BWC
Sentencing Memorandum

United States v. Mateo-Espejo, 426 F.3d 508, 514 (1st Cir. 2005)).  In other words, the court at sentencing must be sure that they are comparing "defendants with similar records who have been found guilty of similar criminal conduct . . ." Id. at 1102 (quoting the purposes of the United States Sentencing Commission at 28 U.S.C. § 991(b)(1)(B)).

<div align="center">47.</div>

Former Minneapolis police officer Derek Chauvin was sentenced to 20 years in prison for violating the civil rights of George Floyd, which resulted in the death of Mr. Floyd on May 25, 2020. United States v. Chauvin, Case No. 0:21CR108 (D. Minn. 2021).   The Department of Justice Civil Rights Division charged Chauvin with Deprivation of Rights, a violation of 18 U.S.C. § 242.[7]  The Government contended that Chauvin violated Mr. Floyd's rights "when he pressed his knees into the man's neck and back and ignored his cries for help." Holly Bailey, *Chauvin Sentenced to 20 Years for Violating Floyd's Federal Civil Rights,* WASH. POST, July 7, 2022.

---

[7] The difference between Chauvin's offense of 18 U.S.C. § 242 and McMichael's offense of 18 U.S.C. § 245 is that Chauvin was alleged to have violated rights under color of law.  Because both offenses resulted in the death of the victim, both cases could have resulted in Life sentences for the respective defendants.   Indeed, Chauvin agreed that the Guidelines calculation in his case was Life imprisonment. Chauvin, Case No. 0:21CR108, Doc. 142 at 13 (D. Minn. 2021).  Therefore, for purposes of comparing offenses, this Court should conclude that they are sufficiently similar.

48.

The negotiated plea signed by Chauvin and approved by the district court in Minnesota required a federal sentence of 20 to 25 years,[8] to be served concurrently with his state sentence. <u>Chauvin,</u> Case No. 0:21CR108, Doc. 142 at 14-15 (D. Minn. 2021).  In connection with his federal plea, Chauvin admitted in open court that he kept his knee on Mr. Floyd's neck and body even as he heard Mr. Floyd saying he could not breathe and lost consciousness. <u>Id.</u> at 2.  Chauvin also ignored the pleas of bystanders to check Mr. Floyd's pulse and prevented others from providing aid. <u>Id.</u> at 5.  Finally, and as revealed during Chauvin's state trial, prosecutors demonstrated that Chauvin applied force to Mr. Floyd's neck for a total of <u>nine minutes 29 seconds.</u> <u>Id.</u> at 3 (emphasis added); <u>see</u> <u>also</u> Nicholas Bogel-Burroughs, *Prosecutors say Derek Chauvin Knelt on George Floyd's Neck Longer than Initially Reported,* N.Y. Times, March 30, 2021.

49.

Greg McMichael's conduct differs from that of Chauvin in three significant ways.  First, Chauvin's actions were the direct and proximate cause of Mr. Floyd's death.  It is inarguable that Chauvin's left knee across Mr. Floyd's neck, back, and shoulder, and right knee on Mr. Floyd's back and arm, resulted in the death of Mr. Floyd. <u>Chauvin,</u> 0:21CR108, Doc. 142 at 2.  Greg McMichael did not pull the trigger

---

[8] The negotiated plea in Chauvin's case was submitted pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).

<u>United States v. Gregory McMichael</u>
Case No.: 2:21CR22-LGW-BWC
Sentencing Memorandum

that ended Mr. Arbery's life; that action was caused by Travis McMichael.  Second, Chauvin had approximately nine-and-a-half minutes to consider the ramifications of his actions and remove his knees from Mr. Floyd's body, but ultimately chose not to do so.  Conversely, by the time Greg McMichael exited the bed of the pick-up truck and approached, Travis McMichael had already fired the fatal shots that killed Mr. Arbery.  In other words, the time for reflection and reaction was far more limited in the case of Greg McMichael.  Lastly, Chauvin appeared before his sentencing court as a police officer with a history of brutality.[9]  Greg McMichael has no history of police brutality or excessive violence.

50.

Despite these glaring differences, Chauvin received a low-end sentence of 20 years, even though the sentencing court had a range of 20 to 25 years pursuant to the plea agreement.  Therefore, sentencing Greg McMichael to anything greater than that received by Chauvin would create the precise disparity in sentence that § 3553(a) hopes to avoid.

---

[9] As part of the negotiated plea, Chauvin stipulated that on or about September 4, 2017, while acting under color of law, he deprived Juvenile 1 of his constitutional rights by holding Juvenile 1 "by the throat" and "[striking] Juvenile 1 multiple times in the head with a dangerous weapon, resulting in bodily injury to Juvenile 1."  Chauvin also admitted to "using unreasonable and excessive force on Juvenile 1 by holding his knee on Juvenile 1's neck, shoulders, and upper back for between fifteen and sixteen minutes." Chauvin, Case No. 0:21-CR-108, Doc. 142 at 6-8 (D. Minn. 2021).

United States v. Gregory McMichael
Case No.: 2:21CR22-LGW-BWC
Sentencing Memorandum

51.

5. <u>To properly account for Greg McMichael's age and medical condition.</u>  Greg McMichael's age and poor health demand a heightened level of care.  He is 66 years old and has both a personal and family history of ailments.  He has suffered at least one stroke and has had multiple stents inserted into his body.  He has an implanted monitor for fibrillation that, because of his present incarceration, is not being utilized.  He had an angioplasty in the last sixty days to reduce 90% occlusion of an artery to 50% blockage.  He suffers from severe swelling of his feet and legs and struggles with shortness of breath.  Diagnosed with major depression and anxiety over 20 years ago, Greg McMichael's mental health also needs to be monitored and treated with medication and counseling.  It is quite clear that access to medical professionals and care is historically greater on the federal level than the state; the Department of Justice's ongoing investigation into Georgia prisons supports this contention.  For these reasons, as well as the ongoing federal investigation into the adequacy of the conditions of Georgia prisons, it is prudent to retain Greg McMichael in federal custody and assign him to a federal correctional institution.

52.

Greg McMichael's wife, Leigh, has submitted a letter in support of her husband, which is attached to this Sentencing Memorandum.  It should be noted, as

well, that she is both the wife of one defendant and the mother of another.   She

concludes her letter stating,

> The death of Ahmaud Arbery was a tragedy of epic
> proportions.  My Family cannot imagine the pain and hurt that
> the Arbery Family and friends must be experiencing.   I am
> resigned to the fact there is nothing anyone in the McMichael
> Family can say or do to ease their hurt, but nonetheless, I offer
> my deepest sympathies.
>
> Please have Mercy on Greg.   His intention in this
> tragedy was not to hurt anyone.
>
> <div align="right">Leigh McMichael Letter</div>

53.

## IV.  Conclusion

There is nothing easy or simple about this case.  It involved the gruesome and

altogether avoidable death of a young man whose last moments are preserved forever

in haunting video.   It showcased repugnant text messages and postings that

displayed a racist bent that, even after decades of societal progress, still clings to

some.   There is also little doubt that Mr. Arbery's family desires the most severe

sentence this Court can give, and they likely wish that sentence to be as arduous as

possible.  Their wishes are understandable, of course, because they are enduring the

most painful loss imaginable.   Although the family's wishes must be taken into

account, it remains the responsibility of this Court to mete out a punishment

United States v. Gregory McMichael
Case No.: 2:21CR22-LGW-BWC
Sentencing Memorandum

grounded in the principles of § 3553(a): that the punishment be "sufficient but not greater than necessary;" that it account for the actions, history, and specific characteristics of this particular defendant, Greg McMichael; and that it not create a disparity among similarly situated defendants.

<div align="center">54.</div>

For the aforementioned reasons, Greg McMichael respectfully requests that this Honorable Court:

A.  Sentence him to serve a total of 240 months of confinement, including the seven (7) years for brandishing a firearm during a crime of violence; and

B. Retain custody of Greg McMichael at a federal correctional institution for the duration of any such confinement, or alternatively, until the current investigation into the conditions of Georgia state prisons is completed and assurances can be provided regarding Greg McMichael's safety and care.

Such a sentence will be sufficient but not greater than necessary to achieve the sentencing goals of 18 U.S.C. § 3553(a).

This 1st day of August, 2022.

<div style="margin-left:40%">
Respectfully submitted,

BALBO & GREGG
ATTORNEYS AT LAW, P.C.

/s A. J. Balbo
A. J. Balbo, Esq.
Georgia Bar No.142606

31 of 33
</div>

United States v. Gregory McMichael
Case No.: 2:21CR22-LGW-BWC
Sentencing Memorandum

P. O. Box 1297
Richmond Hill, GA  31324
(912) 459-1776 – Telephone
(912) 459-1777 – Facsimile
aj@balbogregg.com


Attachment
1.   Letter from Leigh McMichael

<ins>United States v. Gregory McMichael</ins>
Case No.: 2:21CR22-LGW-BWC
Sentencing Memorandum

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served all the parties in this case with a copy of this Sentencing Memorandum in accordance with the directives of the Court Notice of Electronic Filing ("NEF"), which was generated as a result of electronic filing.

This <u>1st</u> day of <u>August</u>, <u>2022</u>.

Respectfully submitted,

BALBO & GREGG
ATTORNEYS AT LAW, P.C.

<u>/s A. J. Balbo</u>
A. J. Balbo, Esq.
Georgia Bar No.142606

P. O. Box 1297
Richmond Hill, GA  31324
(912) 459-1776 – Telephone
(912) 459-1777 – Facsimile
aj@balbogregg.com

<u>United States v. Gregory McMichael</u>
Case No.: 2:21CR22-LGW-BWC
Sentencing Memorandum