1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


UNITED STATES OF AMERICA         )
                                  )
      vs.                  )
                                  )          CASES NO.
TRAVIS McMICHAEL            )  2:21-CR-00022-LGW-BWC-1
GREGORY McMICHAEL          )  2:21-CR-00022-LGW-BWC-2
WILLIAM BRYAN, also known as  )  2:21-CR-00022-LGW-BWC-3
Roddie,                      )
                                  )
_____Defendants._____)




MOTIONS HEARING
BEFORE THE HONORABLE BENJAMIN W. CHEESBRO
January 21, 2022; 10:10 a.m.
Brunswick, Georgia

APPEARANCES:

For the Government:          TARA M. LYONS, Esq.
                             U. S. Attorney's Office - Augusta
                             P. O. Box 2017 (30903)
                             600 James Brown Boulevard Suite 200
                             Augusta, Georgia  30901
                             (706) 724-0517
                             tara.lyons@usdoj.gov

                             BARBARA (BOBBI) BERNSTEIN, Esq.
                             CHRISTOPHER PERRAS, Esq.
                             United States Department of Justice
                             Criminal Section, Civil Rights
                                  Division
                             950 Pennsylvania Avenue NW
                             Washington, DC 20530
                             (202) 353-0032
                             (202) 307-6962
                             bobbi.bernstein@usdoj.gov
                             christopher.perras@usdoj.gov

```
For the Defendant            AMY LEE COPELAND, Esq.
Travis McMichael:            Rouse + Copeland, LLC
                             24 Drayton Street
                             P. O. Box 23358
                             Savannah, Georgia  31403-3358
                             (912) 544-0910
                             alc@roco.pro


For the Defendant            ATTILIO J. BALBO, Esq.
Gregory McMichael            Balbo & Gregg
                             P. O. Box 1297
                             Richmond Hill, Georgia  31324
                             (912) 459-1776
                             aj@balbogregg.com



For the Defendant            JAMES PETE THEODOCION, Esq.
William Bryan:               J. Pete Theodocion, PC
                             507 Walker Street
                             Augusta, Georgia  30901
                             (706) 722-3000
                             theodocion01@comcast.net


Reported by:                 Debbie Gilbert, RPR, CCR
                             Official Court Reporter
                             801 Gloucester Street
                             Post Office Box 1894
                             Brunswick, GA 31521-1894
                             (912) 262-2608 or (912) 266-6006
                             debra_gilbert@gas.uscourts.gov



                                   - - -
```

3

1                  P R O C E E D I N G S

2              (Call to order at 10:10 a.m.)

3         THE COURT:  Ms. Mixon, please call the case.

4         THE CLERK:  Case Number 21-CR-22, United States of

5    America versus Travis McMichael, Gregory McMichael, William

6    Bryan.  Tara Lyons, Bobbi Bernstein, Christopher Perras for the

7    Government; Amy Lee Copeland, A. J. Balbo, Pete Theodocion for

8    the Defense.

9         THE COURT:  Ladies and gentlemen, let me first address

10   our COVID-19 protocols.  At this time, you are not required to

11   wear a mask while you're here in the courtroom and as you move

12   throughout the courthouse, although you are certainly permitted

13   to do so, and if you have a health need or you just feel more

14   comfortable, you're encouraged to do so.

15         I would also encourage you to utilize the hand sanitizer

16   and try to maintain your social distance as best as you are able

17   to do today.

18         Now, we are scheduled here today for a motions hearing

19   in this matter, and as a preliminary point, I will note that

20   there are certain matters that are filed and pending in this

21   case on the docket and some of those matters are under seal.

22         My intention today is to conduct an open session at the

23   start of the proceedings to deal with those unsealed matters,

24   and then for any of those sealed matters to move to a closed

25   session, and during that closed session, I would exclude from

4

1    the courtroom everyone except the parties to the case, the

2    defendants and their counsel and then members of the court staff

3    as well.

4              Any objection to that procedure, Ms. Lyons?

5         MS. LYONS:  No, Your Honor.

6         THE COURT:  Ms. Copeland, any objection?

7         MS. COPELAND:  No, Your Honor.

8         THE COURT:  Mr. Balbo?

9         MR. BALBO:  No, Your Honor.

10        THE COURT:  Mr. Theodocion?

11        MR. THEODOCION:  No, sir.  I did want to, if I may at

12   this time, move that my motions in limine, Document Number 105,

13   be under seal as well.  In my motion, I took great pains not to

14   be graphic in the motion and so ... but based on the evidence I

15   believe The Court is going to hear today I would move that that

16   be under seal as well.

17             THE COURT:  Any opposition to that, Ms. Lyons?

18             MS. LYONS:  No, Your Honor.

19             THE COURT:  That request is granted and that is placed

20   under seal and so it will be taken up in that separate session

21   as well.

22             Now, regarding the matters that are not under seal,

23   there's one motion in limine that is currently pending.  That is

24   Document Number 122 filed by the Government and that is a motion

25   asking for a court order to preclude any improper argument about

5

1    reference to the outcome of the state prosecution.

2         Now, responses for that motion are not due yet.

3    However, I did want to give defendants the opportunity if they

4    are in a position to state their position on that motion.

5         If they are, we can take that issue up today, Ms.

6    Copeland.

7         MS. COPELAND:  Thank you, Your Honor.  We had

8    discussions with the Government about this, and, of course,

9    we're not going to get up and argue to the jury "They have been

10   convicted in the state trial; that's enough; this should go

11   away," but, Your Honor, there is some proper argument to the

12   extent that we would argue this is not a murder trial; you are

13   not here before us here today on murder charges, and so we have

14   worked out with the Government kind of what is permissible to

15   say and what is not permissible to say.

16        We are all onboard with that.  We had a conference.

17   We're good to go on what we understand.  The Government also

18   informed me that it neglected to mention the fact of any sort of

19   discussions of resolution of this case in that motion.

20        Of course, we're not going to bring those up either, and

21   so we have tried to work it out between ourselves.  If I haven't

22   stated our agreement accurately, I'm sure the Government will

23   correct me, but we have discussed it and that is our position.

24        THE COURT:  Any disagreement with any of that?

25        MS. BERNSTEIN:  No, Your Honor, that's an accurate

6

1   statement.  My understanding, which I think is the same as what

2   Ms. Copeland just said, is that the parties have agreed that the

3   type of implicit or explicit argument that the Government was

4   moving to preclude would, in fact, be improper.

5        So not only any suggestion, any suggestion from the

6   Government that a guilty conviction in the state trial should

7   lead to a conviction in the federal trial or any implication,

8   either explicit or implicit, from the Defense that the

9   defendants have been punished enough and therefore should be

10   acquitted or that continuing federal prosecution is somehow

11   improper or politically motivated.

12        I think everybody has agreed that those kind of

13   arguments, explicit or implicit, would be improper, and what the

14   Government agreed with the Defense, the Government agreed with

15   the Defense that it would be perfectly proper for them to argue

16   "This is not a murder case; there are different elements; this

17   is a hate crime, kidnapping, different elements that need to be

18   proved," that, of course, would be completely proper.  So, yes,

19   with that understanding, that is the agreement that we've come

20   to.

21        THE COURT:  Mr. Balbo, anything you would like to add on

22   this?

23        MR. BALBO:  No, Your Honor, I think Ms. Bernstein and

24   Ms. Copeland adequately recounted what our understanding is.

25        MR. THEODOCION:  I concur.

7

1    THE COURT:  Well, I do want to be precise about how this

2    motion is disposed of.  It appears to me there is no opposition

3    to the motion as it is drafted.  So my inclination is to grant

4    that motion as unopposed recognizing the agreements that have

5    been reached and the parties' positions.  Any comment on the

6    disposition of the motion?

7    MS. BERNSTEIN:  I would add to that, Your Honor, may we

8    amend the motion in court today to include a motion to preclude

9    any discussion of any possible or potential negotiations.  That

10   was another part that we agreed to but was not part of the

11   express motion that we filed.

12   THE COURT:  And to clarify, that is any negotiation or

13   possible resolution of the federal case?

14   MS. BERNSTEIN:  Yes.

15   THE COURT:  Not the state case; correct?

16   MS. BERNSTEIN:  Actually I think it would encompass

17   both.

18   MS. COPELAND:  Everything kind of flowed together and so

19   I'm comfortable with simply "resolution of events arising from

20   the February 23rd, 2020 incident," Your Honor.

21   THE COURT:  I understand.

22   MS. COPELAND:  But Ms. Bernstein is correct.  She had

23   discussed that with us and we were all onboard with it, too.

24   THE COURT:  So I will permit the Government to amend its

25   motion orally here today to also include a pretrial ruling to

8

1    preclude any reference to any negotiation or resolution of any

2    charges arising from the events giving rise to this case, and

3    based on the comments from defense counsel here today, I will

4    grant that motion as unopposed.

5         MS. BERNSTEIN:  Thank you, Your Honor.

6         THE COURT:  Now my intention, once we move to the closed

7    session of these proceeding, is to remain in that closed session

8    for the remainder of our hearing unless there is something that

9    develops during the course of that proceeding that requires

10   going back into an open session.

11        With that in mind, counsel for the Government, are there

12   any other matters that need to be addressed during this open

13   session?

14        MS. LYONS:  Your Honor, the Government -- I beg The

15   Court's indulgence.

16        No, Your Honor.  Thank you.

17        THE COURT:  Ms. Copeland, anything else to address in

18   the open session?

19        MS. COPELAND:  No, Your Honor.

20        THE COURT:  Mr. Balbo?

21        MR. BALBO:  No, Your Honor.

22        THE COURT:  Mr. Theodocion?

23        MR. THEODOCION:  No, sir.

24        THE COURT:  At this time, we will move to the closed

25   session of these proceedings.  If our marshals would please

1   assist all those present here today who are not either parties

2   to this case or counsel or members of the court staff, please

3   exit the courtroom at this time.

4        I will note for the record that at this time all other

5   attendees have left the courtroom and the only individuals who

6   are present are again the parties, counsel, members of the court

7   staff.  We are still on the record, of course, but these

8   proceedings will remain closed and any transcripts will remain

9   under seal under further order of The Court.

10       Now, regarding the matters that are under seal

11  currently, I'm very familiar with the briefing in this case.

12  There won't be any need for any party to restate anything that's

13  in the briefs during this portion of the proceedings.

14       I do want to first address those matters that I think

15  are unopposed so we will go through those now.  Regarding the

16  Government's motion in limine to preclude the use of improper

17  bad character evidence of the victim -- that is Document Number

18  109 -- Defendants Travis McMichael and Gregory McMichael have

19  filed responses stating no opposition to that motion and I want

20  to confirm Mr. Bryan has no opposition or if there is opposition

21  state it now.

22       MR. THEODOCION:  We have no opposition to that, Your

23  Honor.

24       THE COURT:  I will grant that motion as unopposed.

25       Yes, Ms. Copeland.

1          MS. COPELAND:  Your Honor, I'm sorry.  My only exception

2     is if for some reason the Government put up independent

3     character witness of Mr. Arbery, then I -- if they open the door

4     to that, then I think I can respond.

5          THE COURT:  I understand.  Ms. Bernstein, Ms. Lyons, any

6     comment on that?

7          MS. BERNSTEIN:  Understood.

8          THE COURT:  I read the motion to imply that, but I

9     appreciate the comments on the record as well, so the motion

10    will be granted as unopposed with that recognition as well about

11    opening the door to that issue.

12         That leaves the Government's motion in limine to admit

13    evidence of motive.  That is Document Number 110.  Now in that

14    motion, the Government delineates five categories of evidence

15    that it seeks a pretrial ruling on, specifically that it be

16    allowed to offer that evidence to prove Defendants' motive to

17    commit the charged crime.

18         Now of those five categories, some portions appear to be

19    unopposed but I want to confirm that those categories are

20    unopposed here today.

21         The first is Category 3, which is evidence that

22    Defendants Travis McMichael and Gregory McMichael supported

23    vigilantism; Category 4, which is evidence that Travis McMichael

24    called for violence against African-American; and Category 5,

25    which is evidence of Defendant Travis McMichael's comments about

1   neighborhood crime in the months leading up to the charged

2   incident.

3          As I read the briefing, it appears that those three

4   categories are unopposed; is that correct, Ms. Copeland?

5          MS. COPELAND:  That is, Your Honor, and Category B, the

6   association of African-Americans with criminality, as the

7   Government describes it, is largely unopposed.  There is just

8   one message in that that I think forces the readers to make a

9   number of assumptions, and I wonder if that can even pass the

10  gatekeeping test of 404(b)(2) and so that's the carveout there,

11  but those three categories are definitely unopposed.  Everything

12  but that single message in Category B is unopposed.

13         THE COURT:  To be clear, that's the -- I'll just refer

14  to it as the Dixville comment.  That's the best shorthand I

15  have.

16         MS. COPELAND:  The Dixville neighborhood comment, yes,

17  Your Honor.

18         THE COURT:  And in the briefing, there was some

19  ambiguity about which category that might fall under.  We will

20  take that up in just a moment.

21         I want to be clear that that particular piece of

22  evidence, the Government's motion is opposed on that piece of

23  evidence regardless of the category.  Otherwise, 3, 4 and 5 are

24  unopposed by Travis McMichael; correct?

25         MS. COPELAND:  That's correct, Your Honor.

12

1          THE COURT:  And as to Gregory McMichael?

2          MR. BALBO:  That's correct, Your Honor.  Categories 4

3   and 5 do not apply to Gregory McMichael.  Category 3, which

4   does, we are not opposing evidence of the vigilantism.

5          THE COURT:  And while the Categories 3,4 and 5 do not

6   apply to Mr. Bryan at all, I do still want to hear from Mr.

7   Theodocion.  Any opposition on those categories of evidence?

8          MR. THEODOCION:  No.

9          THE COURT:  Thank you, Mr. Theodocion.

10          So that leaves Category 1 or A in the briefing, which is

11   evidence of Defendants' racial animus against African-Americans,

12   and then Category 2, which is evidence that Defendants

13   associated African-Americans with criminality.

14          I do want to clarify as to Mr. Bryan because, as we

15   discussed in the open session, there was a motion in limine,

16   Document Number 105, filed in advance of the Government's motion

17   that took up some of those same issues.  There is not a written

18   response to the Government's motion, but as I construe the

19   briefing, Defendant's motion sufficiently sets out --

20          MR. THEODOCION:  Competing motions, yes, sir.

21          THE COURT:  -- that those two categories are opposed as

22   to Mr. Bryan as well; correct?

23          MR. THEODOCION:  Yes, sir.

24          THE COURT:  So I will structure the remainder of the

25   hearing in this way.  I want to hear from the Government first

1   as it is their motion, and I would like the Government to

2   address these two categories of evidence and offer any

3   additional argument that they have beyond that which is

4   contained in the briefing.

5          If there is none, that is fine, but I will give them an

6   opportunity to do so.  I do have a few questions on a couple of

7   these topics.  I will then hear from counsel for each defendant

8   to the extent that they wish to make an oral presentation today

9   and then I will go back to the Government for any rebuttal

10  argument at that time.  Who will be arguing on behalf of the

11  Government?

12          MS. LYONS:  Mr. Perras, Your Honor.

13          THE COURT:  Mr. Perras, if you will step to the podium.

14          MR. PERRAS:  Thank you, sir.  May I begin?

15          THE COURT:  You may.

16          MR. PERRAS:  So start with Category A, which is evidence

17  of general racial animus.  It's well-established that evidence

18  of Defendants' general racial animus is admissible in a hate

19  crime prosecution to prove the defendant acted because of race.

20          The cases cited in Footnotes 9 through 11 of the

21  Government's brief, there's ten different hate crimes cited.

22  The most prominent among them are *Dunnaway* and *McInnis,* and

23  those cases make clear that Defendants' general racial animus,

24  so use of racial slurs, listening to racial music, racial

25  behavior, those are all relevant in a hate crime case.

14

1          This is a case in which Travis McMichael, Greg McMichael
2     and the other defendant, the jury is going to be asked to
3     determine why they acted, why they decided to chase Ahmaud
4     Arbery through the neighborhood and not only why they initially
5     made that decision to chase after him but what fueled the
6     disproportionate reaction that they had and the extent of it
7     that led to the shooting.

8          To start off, I'm not aware of any hate crime case and
9     defense counsel did not cite one in their response standing for
10    the proposition that evidence of a defendant's racial animus
11    isn't relevant in a hate crime prosecution.

12         Now, Ms. Copeland argued that the prosecution's theory
13    of the case is that Travis McMichael used race as a proxy for
14    criminality and so the prosecution of racial motive should be
15    limited to evidence that the defendant used race as a proxy for
16    criminality, so in other words, the Category B evidence.

17         That proposition, that rule that she's asking for, just
18    isn't supported by the case law.  So if that were the rule, then
19    the racial evidence in the *Dunnaway* and *Allen* cases would have
20    been limited to evidence that the Skinheads in those cases
21    didn't like black people in their parks, but it wasn't.

22         In those cases, the jury was allowed to hear about all
23    of the evidence of their racial views and animus because it's
24    relevant to why they particularly targeted black men in that
25    park.

1          If that were the rule, the racial evidence in the cross-

2    burning cases cited by the Government, so *Magleby*, *Skillman*,

3    *Shellman*, would have been limited to evidence that the

4    defendants didn't like black people living in certain

5    neighborhoods, but it wasn't.

6          The Government put on evidence of general racial animus

7    because it's relevant to show why they targeted particular black

8    people in their community.

9          That's what we're seeking to admit here in Category A.

10   In this case, the jury is going to be asked to decide not only

11   why the defendants made that initial assumption about Mr.

12   Arbery, but why they acted on it.

13         And that's really important because we're not here just

14   because the defendants made a racial assumption about Mr.

15   Arbery.  Lots of people make racial assumptions in this country.

16   That's sad but it's not a crime.

17         We're here because they acted on those racial

18   assumptions and they took an extreme reaction.  They didn't call

19   the police.  They grabbed their guns.  They jumped into their

20   trucks.  They chased after him.  They struck him with their

21   cars.  They got out of the cars multiple times with their guns.

22         And that's why it's important for the jury to hear about

23   not just racial stereotypes and assumptions that they made about

24   black people and their association with criminality but also the

25   other components of their racial views that fueled that

1    disproportionate reaction.

2           So if you look at some of the exhibits in Category A,

3    some of those stand for Travis McMichael's racial resentment, so

4    if you look at the Facebook message chain about the DMV, Travis

5    McMichael is complaining to his friend that he failed a test for

6    the commercial driver's license the fifth time.  He keeps going

7    and he keeps failing and he blames his failure on the N-words

8    running the show is how he describes it.  He's angry at these

9    black people.

10          You see it in other posts.  He posts to everybody on

11   Facebook that he is sick and tired of black people leeching off

12   the Government.  So it's not just general racial animus.  It's

13   tinged with anger and resentment, and that helps inform the jury

14   why two men who made racial assumptions were so willing to act

15   on those assumptions.  And so the nature and depth of their

16   racial resentment and anger is relevant in this case.

17          I would like to address some of the 403 arguments made

18   by defense counsel regarding the prejudicial nature of the

19   evidence.  Now most evidence of racial animus in hate crimes

20   cases --

21          THE COURT:  One moment, Mr. Perras, before you go to

22   403, in terms of the relevance theory that we've been

23   discussing, it appears to me that the 401/402 analysis folds

24   into the 404 analysis in the sense of what is the relevance

25   theory and what purpose is it being offered for.

1        As I read the brief filed on behalf of Travis McMichael,

2   it is not an expression that the law requires the theory of the

3   case be limited to something like associations with criminality

4   but rather that the Government in this case particularly has

5   adopted a theory of the case that it's limited to the

6   associations of criminality.

7        There is also a suggestion that there is a material

8   distinction most likely in the 404(b) context between motive and

9   intent.

10        And the read again that I have -- and I will hear from

11   Ms. Copeland momentarily -- but the read that I have is that

12   this is a motive theory and that the Government has not sought

13   to admit this evidence on the basis of intent and therefore that

14   is why Category B may be permissible but Category 1 is not.

15        So my question, Mr. Perras, is:  Is that accurate?  Is

16   the Government proceeding purely on a motive theory or is it the

17   intent to offer this evidence both to motive and the defendants'

18   intent in this action or something else?

19        MR. PERRAS:  It's the middle one, Your Honor, "or

20   something else."  If you look at the racial evidence in hate

21   crime cases, courts generally use those words interchangeably,

22   motive, intent, discriminatory intent, racial animus, elements

23   of the crime.  They all sort of mean the same thing, why the

24   defendants did what they did; did they act because of race.

25        So we're proceeding really under all of those.  We have

1    the burden of proof to prove beyond a reasonable doubt that the

2    defendants acted because of race and color, and that is what

3    this evidence is being offered to show.

4         With respect to the earlier question about the

5    Government's adoption of a theory of the case, I do want to be

6    clear about that.

7         The Government has articulated basically a theory of the

8    case about why this happened, and a part of that is based on

9    assumptions about criminality, so Travis and Greg McMichael,

10   Roddie Bryan eventually, they see a black man running down the

11   street.  They assume he's a criminal; they decide to chase him.

12        That is one component of their intent, their motivation,

13   what moved them to do what they did -- right -- but there is

14   also other components of that.  There's that underlying racial

15   animus and resentment, right, and that's how they differ from

16   the ordinary garden-variety racist who might make assumptions

17   about people, share racist memes over the Internet, but isn't

18   moved to chase down a black man down the street, grab a gun and

19   shoot him.

20        So that underlying animus, racial resentment, that is an

21   aspect of this case, an important one, that explains not only

22   why they moved to chase him but why they took the extreme and

23   disproportionate measures that others didn't under the

24   situation.

25        So others in this neighborhood, when they saw Mr.

1   Arbery, they called the police, they called the non-emergency

2   line, didn't chase after him; they didn't jump in their cars.

3          And when you look at the depth and the anger of the

4   racial resentment that is shown in Travis McMichael's texts, his

5   social media posts and witness testimony, that helps the jury

6   understand, "Oh, okay, I get it," and so that's why we're

7   offering that evidence.

8          THE COURT:  Mr. Perras, my next question is about the

9   role of Rule 404.  To me, there's some ambiguity in the

10  Government's position, perhaps because some ambiguity in the

11  case law as well.

12         Is it the Government's position that 404(b) governs this

13  determination and that the evidence is admissible for intent and

14  motive under the provisions of 404(b); secondarily, that because

15  it is an element of the offense, 404(b) simply does not apply or

16  even touch on this evidence; or third, that because all of that

17  racial animus evidence is intrinsic to the offense charged that

18  it falls outside of the scope of 404?

19         MR. PERRAS:  Your Honor, I agree that the case law

20  really is ambiguous on this issue, so there are a lot of racial

21  hate crime cases that get into the defendants' prior statements,

22  prior acts.

23         They don't even bring up Rule 404(b), and in those cases

24  the discussion basically is, well, this is direct evidence of an

25  element of the crime, and so they don't even talk about 404(b),

1    and so the Government's argument is basically an argument in the

2    alternative, that this is direct evidence of a crime.

3    Therefore, it's not 404(b).

4           But even if it were 404(b), it would admissible as

5    evidence of motive and intent, and so if you look, in the

6    Government's brief, we cited cases of I think the *Franklin* case

7    -- there are several other cases -- the *Ballentine* case, cases

8    where a defendant is charged with committing a hate crime, and

9    the Government put on 404(b) evidence of other racially

10   motivated acts, so other racially motivated hate crimes that

11   they committed, and that was a 404(b) analysis, and that was a

12   more clear 404(b) analysis because you're talking about prior

13   bad acts, which are clearly 404(b).

14          In those cases, the court said, "Well, it's a hate

15   crime; it's clearly relevant to motive; motive is an element of

16   the crime; this stuff comes in."

17          Our argument is that it's less clear here because we're

18   not talking about acts.  The Government isn't putting on

19   evidence that the defendants committed prior bad acts.  We're

20   putting on evidence of the defendants' own statement of racial

21   animus, which are similar to the witness testimony in the

22   *Dunnaway* case and the other cases we cited where they just said

23   "Yeah, the defendant used the N-word a lot; he talked about how

24   he didn't like, you know, black people."  Here, instead of

25   witness testimony, we're just using the defendants' own

21

1   statements in texts and social media.

2        THE COURT:  Under one of those headings that I kind of

3   laid out is that, the last one, which is that the racial animus

4   evidence is inextricably intertwined with the charged offense

5   and therefore just falls outside of 404(b).  That analysis comes

6   up frequently in cases applying 404(b), but I don't recall

7   seeing any cases where it was expressly addressed in the context

8   of racial animus in hate crimes.

9        Is there a case that you can point to that would suggest

10  that it just falls entirely out of 404(b) because of the

11  intertwinement?

12       MR. PERRAS:  I don't, Your Honor, and the Eleventh

13  Circuit cases, *Edouard* and *Moore*, which were not hate crimes, it

14  was just more of this type of evidence.

15       If it concerns the motive for the crime, it's so

16  important that it's inextricably intertwined and therefore it's

17  not 404(b), but I could not find a hate crime case specifically

18  using that logic.  Most of the hate crime cases don't analyze

19  404(b) at all and just say this is direct evidence of a key

20  element of the crime; therefore, it's not 404(b).

21       THE COURT:  I've taken you a little off course.  You

22  were about to address the 403 arguments.  If you would take

23  those up now.

24       MR. PERRAS:  Yes, Your Honor.  So if you look at all of

25  the defendants' texts and social media evidence, there was a lot

22

1    of terribly offensive stuff in there and even offensive racial

2    jokes and racial comments that the Government isn't seeking to

3    offer because the Government deemed that there was a lot of

4    spill-over prejudice in those comments, that it could just cause

5    a jury to dislike the defendants, irrespective of the racial

6    component of it.

7         The stuff that we specifically are seeking to offer is

8    stuff that's directly tied to racial animus and not just a

9    racial joke or garden-variety racism, but resentment, deep-

10   seated anger, because that's what's relevant to this case, and

11   so courts have said, including the Eleventh Circuit, for

12   something to be unfairly prejudicial, it needs to be prejudice

13   apart from the thing that makes it probative, and here the thing

14   that makes it probative is what makes it prejudicial so it's not

15   unfairly prejudicial.

16        I also think it's really important to note that this

17   stuff isn't cumulative because the issue for the jury isn't

18   whether the defendants held racial views, were racists, but it's

19   whether they were so extreme and deep-seated that they were

20   willing to act on them.

21        There's a lot of case law support that that is why you

22   really can't have cumulative evidence in this situation because

23   it's really important for the jury to get the real picture, not

24   just that a defendant has a racial view or says a racial joke,

25   but he has deep-seated anger and resentment that might fuel him

1    to act in the way that he did.

2         I would also point out that Category A evidence provides

3    important context for some of the other evidence in the other

4    categories that's going to be coming in.  You know, if this were

5    not allowed in, the Defense could argue, "Oh, well, maybe he's

6    joking; maybe he didn't really mean it."  This Category A

7    evidence helps explore sort of the reasons why he feels

8    aggrieved and angry at black people and shows that he's not

9    joking, shows that he means it.

10        The last thing I would point out, Your Honor, is that

11   it's the type of evidence that is critically important to

12   proving the racial component of the hate crime here.  There is a

13   great example of the case in which a person who is accused of

14   making a threat to bomb a judge and no dispute that he made the

15   threat.  The only issue was whether it was a true threat; he

16   really meant it; it wasn't hyperbole.

17        In that case, there is evidence and the Government put

18   on evidence that the defendant associated with ISIS, was pro-

19   ISIS, had radical, radical views and was willing to act on them

20   and the court in that case said, "I can't think of anything more

21   prejudicial than this; this guy is an ISIS sympathizer, but the

22   things about that evidence, what makes it prejudicial, is also

23   what makes it so probative, and it's the key issue in this case,

24   so we cannot exclude it under 403," so we make that similar

25   argument here.

1          Yes, just some of this evidence, it goes to the

2    defendants' racial views and some people could find it

3    offensive, but it's the entire point of this entire case is did

4    the defendants act because of racial animus, and so, because

5    it's really important evidence and it's really the only evidence

6    to show that, we would submit it should not be excluded under

7    403, and it's plainly relevant under 401.

8          THE COURT:  Thank you, Mr. Perras.

9          Ms. Copeland.

10          MS. COPELAND:  Good morning, Judge.  To respond quickly

11   to a few of my colleague's points, Number 1, you asked the

12   question of Mr. Perras about motive against intent, which was it

13   really.

14          In this case, the Government, as the proponent of the

15   evidence, has the burden of proving its admissibility.  That's a

16   pretty clear standard in evidentiary issues.

17          Throughout this brief that the Government filed, this

18   motion to admit, the sole theory that it traveled under is a

19   motive-based theory.  Motive is what motivates you to do

20   something.  Intent is your state of mind.

21          For the Government to say now that this should be

22   admitted for both motive and intent I think is too late.  They

23   have staked a claim that the 404(b)(2) category of evidence that

24   they are seeking to admit is motive-related intent.  The

25   Government used them interchangeably, yes, but it very clearly

1   said this was a motive case.

2          What is the motive the Government is seeking to prove?

3   You can look at Page 16 of the brief, and I quote, "In this

4   case, the Government will seek to establish at trial not only

5   that the defendants assumed on the basis of Mr. Arbery's race

6   that he was a criminal but also that they chased after him and

7   threatened him because their support for vigilantism fueled

8   their desire to personally catch a man they viewed as an

9   African-American criminal."  This is the Government's statement

10  of the motive that they seek to prove and that they seek to

11  argue to the jury.

12         Got out of law school 30 years ago.  I clerked for a

13  judge.  Judge's main statement to us all was that judges should

14  be reasonable.  Based upon that, I wanted to be reasonable.

15  That is why I agreed for the most part (b) through (e) evidence

16  is admissible because this all ties into the Government's

17  motive.  The Category A, though, doesn't.

18         One of the things the Government never addressed here --

19  and I don't think they really addressed in their brief -- is to

20  be admissible under a motive-based theory and even an intent-

21  based theory is that there has to be a substantial similarity

22  between the evidence offered for that purpose and the crime at

23  hand.

24         As I went through in my brief, I summarized the 13

25  different categories or the 13 different discrete elements that

26

1    they intended to introduce under Category A.

2          I'm not sure how being angry that there are too many

3    black people at a Cracker Barrel has anything to do with whether

4    or not you associate African-Americans with criminality and

5    whether, when that is combined with vigilantism, led to what

6    happened on February 23rd, 2020.  These are just not

7    substantially similar.

8          I also want to talk a little bit, too, about all of the

9    cases cited by the Government.  In those cases, Judge, I really

10   tried to distinguish what is coming in exactly.  You know, is

11   this Facebook postings from seven years before an incident, and

12   no, it's really like someone's membership in a Skinhead group

13   where they are talking about doing violence on African

14   Americans, on Mexican people, on women occasionally, and those

15   are the types of evidentiary issues that the courts address and

16   that's the type of evidentiary issues that they let in.

17         I want to get a little bit into, too, this whole notion

18   of 404(b) and the fact that racial animus is something that the

19   Government has to prove that this is just so central to the case

20   that that is why it comes in.

21         Your Honor, preparing for this hearing, I noticed that

22   there actually is a different rule that the Government doesn't

23   cite that's Rule 405(b) that talks about how, if a character

24   trait is part of an element of a crime like intent, then it can

25   come in.

1          As a criminal practitioner, I tend to forget the civil

2     attorneys use the Federal Rules of Evidence, too, but I looked

3     up 405(b).  What are those types of cases where that comes in?

4     That rule is almost exclusively for libel and slander cases, so

5     even under the Federal Rules of Evidence, they do have an

6     exception or they do have a rule that makes character evidence

7     admissible on things like intent, but, like I said, it's pretty

8     narrow.  It's libel and slander.  It's not this giant notion

9     that everything he's ever said boils down into this particular

10    admission of evidence even if it isn't substantially similar and

11    even if it really isn't relevant to the Government's stated

12    motive in this case.

13         Your Honor, I'm happy to answer any questions about

14    this.  I want to highlight, too, the Dixville neighborhood was

15    in Category B, is on Page 10 of the Government's brief --

16         THE COURT:  Let's get into the specifics of that in just

17    a moment.  One threshold issue I think here is about the ability

18    for the Government to advance an intent theory versus being

19    limited to a motive theory.

20         I understand in the brief as you've sort of read their

21    brief that it's limited in that way, but you also acknowledge

22    that they sort of use those terms interchangeably and so do many

23    of the cases that deal with this as well.

24         And so I have two questions on that point.  What is it

25    about the posture of this case now that forecloses the

28

1    Government from expanding it to a general racial animus as

2    opposed to a limited criminality theory?

3         MS. COPELAND:  Your Honor, we're entitled to notice.

4    We're entitled to notice under 16.2.  We're entitled to notice

5    under 404(b) of actions that they choose to do.  I would assume

6    that that notice extends to the Government's theory.  If they

7    had talked about how this was relevant to both motive and

8    intent, I would have briefed the intent issue, too.

9         I was a bit surprised to walk in and hear that today,

10   despite spending 20-something pages talking about why this is

11   relevant to motive that it's actually relevant to an intent-

12   based theory.

13        Since they put it down as a motive theory, that is why I

14   limited my discussion to the motive cases and didn't say, you

15   know, this is okay because some of the cases that they use to

16   support their position on motive also went to identity.

17        I took the Government at their word.  I took the

18   Government at their word that this a motive-based admission

19   under 404(b)(2).  I think it's a little too late for the

20   Government to come back and say, "Oh, we're actually considering

21   it for all these other purposes."

22        THE COURT:  Setting that position aside, looking at the

23   cases that are cited in the briefs, they address intent

24   generally and talk often about racial animus evidence, and from

25   my review of all the cases that have been cited, I've not found

1    a single case that excluded racial animus evidence in a hate

2    crime prosecution based on 404 grounds.  Can you point to one?

3          MS. COPELAND:  Your Honor, I cannot, but I can point

4    this out, and I think this is really important.  Even if you

5    address this under an intent-based theory, there has to be a

6    substantial similarity and the Government didn't even endeavor

7    to address that in its briefing and I didn't hear those words

8    out of their mouths here today.

9          Your Honor, the reason why I don't think anybody has

10   ever addressed a case like this is because the Government

11   concedes this is actually a dual-motive case.  This is one that

12   they are going to argue that the two bases of causation in this

13   case are, One, the fact that race was a proxy for criminality

14   when combined with vigilantism led to what happened on February

15   23rd, 2020.

16         The cases that I read on hate crime cases, it's things

17   like Dylann Roof walking into a historically African American

18   church, worshipping with people for 45 minutes, having purchased

19   a gun a few weeks in advance and saying, you know, "I'm doing

20   this because I hate all African Americans," shooting people,

21   making statements, immediately admitting to police officers that

22   this is what's going on.

23         You see this in other cases that I talked about in my

24   brief that the Government cited.  It's the guy that followed the

25   interracial couple and, you know, pepper-sprayed them or beat

1    them up with a pipe.  I forget, it was something terrible,

2    Judge, but this comes in because a few years earlier he had done

3    exactly the same thing, chased an interracial couple to a

4    cul-de-sac and did exactly the same thing.

5         I couldn't find any cases, Judge, where it is just a

6    series of stuff that's been said on social media for years in

7    advance that the Government then shoehorns into a two-motive

8    case to try to prove its hate crime contentions.

9         THE COURT:  But the cases do talk a lot about comments

10   and associations with generalized racial hatred, affiliations

11   with either the Ku Klux Klan or Skinhead movements, not

12   necessarily similar involving identical acts, general comments

13   about racial viewpoints that are relevant to intent, and the

14   language is that it's relevant to establishing racial hatred and

15   that being the intent that the person acted with and that being

16   an essential element for any crimes charged, so perhaps there's

17   not a social media or a temporal distinction in those cases like

18   there is here, but there is certainly -- they are not uniform in

19   that they are all identical acts previously that are related to

20   the ones that are charged.

21        MS. COPELAND:  But, Your Honor, as I read those cases,

22   because I did read a number of hate crimes cases, as I read

23   those cases, these typically involved members of the Ku Klux

24   Klan, the Aryan Nation, other sorts of white brotherhoods,

25   Skinheads, things like that, or people who had been very vocal

31

1    in their desire to harm African Americans, people who are

2    sitting around a picnic and said, "You know, I'd really like to

3    go a bust a black person's head."

4          These are the hate crime cases that are out there.  The

5    Government admits in its brief that my client had never acted,

6    you know, never gone out and hurt an African American person

7    before, didn't belong to any racist thing, any racist

8    organization, any white supremacist organization.

9          I think that's a little different, and I think that's

10   more like the Category B evidence that I think is relevant to

11   what the Government says it's going to prove in this case, that

12   he actively, you know -- there was no evidence that the

13   Government has pointed to my client went out and harmed people,

14   that this February 23rd incident was the first time he had

15   actually had any sort of confrontation like this with a black

16   person.

17         I will give you an example of that, Judge.  I don't know

18   where this is, in what category, but there is a text exchange

19   and there's a video of a black woman running into a crowd of

20   black people I think at a BLM march in St. Louis or something

21   like that, and my client puts on there a comment like "Are you

22   running late with little Timmy; you know, just, you know, here's

23   a solution for you," and he gets a response that says, "Hey,

24   buddy, there's a BLM protest at the riverfront; you want to go

25   down and regulate the zoo with me?"  My client does not respond.

1        And so this to me is -- those are the relevant texts,

2   the ones that talk about what the Government says they need to

3   talk about in their case.  This is what takes it, to me, out of

4   the ambit of all these other cases that talk about racial

5   statements that people have made.  The racial statements that

6   people have made talk about membership in hate groups or talk

7   about active desires to harm people, and I think that's where

8   the distinction is in this case.

9        THE COURT:  Ms. Copeland, let's address the Dixville

10  post.

11        MS. COPELAND:  Sure.

12        THE COURT:  My read of your briefing on this particular

13  piece of evidence is that the primary challenge is that it --

14        MS. COPELAND:  Not probative.

15        THE COURT:  -- requires too many assumptions to get to

16  the racial animus component or the association with criminality

17  component here; is that really the focus?

18        MS. COPELAND:  It does.  404(b)(2), as you know,

19  requires a three-prong test:  Number 1, is it relevant; Number

20  2, did this actually happen, did he say it; and Number 3, is it

21  not unduly prejudicial.

22        Number 2 is did this actually happen, did he actually

23  say, can they knit it up, and I think this is where this one

24  falters.  You have to assume that everyone that Mr. McMichael

25  saw in the neighborhood that day was black.  You have to make a

1   series of assumptions to get yourself to that point where this

2   comes in.  Your Honor, I admit we can address this at trial, but

3   it just seemed to me to be a little far afield.

4         THE COURT:  But those assumptions that you argue would

5   need to be made, wouldn't it be better for the jury to assess

6   those assumptions?

7         MS. COPELAND:  I can talk all day with the jury about

8   those assumptions, Your Honor.

9         THE COURT:  And for the purposes of the pretrial ruling,

10  I do want to know if you agree that you would look at the fabric

11  of evidence that's raised here.  There's another piece of

12  evidence that's addressed in the motion that relates to a

13  Facebook post where your client associated African Americans

14  with government benefits and poverty and things of that nature.

15  Do we not read those two Facebook posts in conjunction with one

16  another?

17        MS. COPELAND:  Your Honor, I think that gets far afield

18  because if you're talking about an association of African

19  Americans with criminality, which is the Government's stated

20  purpose for this motive evidence, it gets far afield to talk

21  about class issues and who requires government benefits, who

22  needs extra assistance.  I just don't think they compute and I

23  don't think they are related, Judge.

24        THE COURT:  What's your articulation on prejudice?

25        MS. COPELAND:  On the Dixville neighborhood?

34

1          THE COURT:  Correct.

2          MS. COPELAND:  Yeah, Judge, you know, I have thought

3     about it.  It was mostly my concern that the Government was

4     making assumptions that it was angry at my client for making.

5     You know, I'm happy, Your Honor -- I will withdraw my

6     disagreement with that.  I'm happy to discuss this with the

7     jury, but that being said, mentioning the name of Trayvon Martin

8     is a totally different kettle of fish.  I think that's a bridge

9     too far, Judge.

10          THE COURT:  The point that Mr. Perras made is that the

11     prejudice that has to arise has to be different than the basis

12     for the probativeness, and what is the prejudice that arises

13     that's separate from the probativeness?

14          MS. COPELAND:  Your Honor, Trayvon Martin is a lightning

15     rod.  When people hear of Trayvon Martin, they think of one of

16     two things.  You know, George Zimmerman got it right, or George

17     Zimmerman is the luckiest man in the world because he should

18     have been, you know, convicted and put under the jail, and, Your

19     Honor, I just think if we're going to try such a heated case

20     that brings up all sorts of racial issues, we need to try a case

21     based on the issues before us.  I don't think we need to invoke

22     the name of Trayvon Martin.

23          You know, I will tell you the Department of Justice in

24     the Michael Brown shooting arising out of Ferguson, one of the

25     things that they found to side with the police officer -- and I

1    get my client wasn't a police officer; I do -- was that the

2    young man grabbed at his gun, tried to grab at his gun.

3          We've got a gun grab here.  I'm not going to bring up

4    the fact that the Department of Justice exonerated and, you

5    know, all the Ferguson stuff blew up, but I just think that -- I

6    think Trayvon Martin is a bridge too far because I think that

7    gives people some very deep-seated connections to a prior case

8    that isn't this case.  We're not even talking about our prior

9    case in this case.  We're not even talking about the state case.

10   I think we have to limit it to the facts and to the evidence in

11   this particular case.

12         THE COURT:  The last topic I would like to address with

13   Ms. Copeland is the fact that in a number of these cases where

14   they've talked about racial animus evidence in hate crimes

15   prosecutions and how it bears on the issue of intent, the courts

16   have repeatedly acknowledged that a limiting instruction is

17   sufficient to avoid any of the concerns that might rise with

18   that and address the specific probativeness of that type of

19   evidence.  Why wouldn't a limiting instruction in this case

20   mitigate that for Category A?

21         MS. COPELAND:  Because you would be letting in a lot of

22   irrelevant evidence.  The Government has in its brief a moment

23   that sort of strikes me that they realize that this is just

24   propensity evidence at the bottom of Page 18.  They are talking

25   about how they just need to disabuse the jury of the notion that

36

1   my guy, honorable Coast Guard veteran, that they need to show

2   the jury his true nature.  And that to me strikes me as nothing

3   but flat-out propensity evidence, flat-out character evidence.

4   He's a bad guy.  He must have done this for racial reasons,

5   because -- you know, I don't think this is admissible in the

6   first place.  I don't think it's relevant.  I don't think it's

7   probative to the motive that they have set forth as being the

8   motive in their case.  I think a limiting instruction would do

9   nothing in this case because it shouldn't have been admitted in

10  the first case.

11       I understand that that's what the case law says and I

12  understand that if The Court admits the evidence we will be

13  getting a limiting instruction.  I just don't think it should

14  come in in the first place, Your Honor.

15       THE COURT:  Thank you, Ms. Copeland.

16       MS. COPELAND:  Thank you, Your Honor.

17       THE COURT:  All right, Mr. Balbo.

18       MR. BALBO:  Good morning, Your Honor.

19       THE COURT:  Good morning.

20       MR. BALBO:  I would like to start first by adopting the

21  arguments made by Ms. Copeland; secondly, I'm not sure I would

22  be able to articulate the law better than she, but I'm certainly

23  going to do my best.

24       I am going to try to amplify the points and apply them

25  to Greg McMichael.  And in preparing for today's hearing and I

1    will tell you I don't usually cite to *Law Review* articles mainly

2    because I find them -- they can be academic and somewhat lacking

3    in practical application, but do I do want to bring one to The

4    Court's attention as The Court makes its way through.  It is an

5    article termed "Character Assassination."  It's a *Columbia Law*

6    *Review* article, and the cite on it is 118 Columbia Law Review

7    769, published in 2018, and it was written by Professors Daniel

8    Capra and Liesa Richter.

9         These folks, though they are a professors and certainly

10   academic, they are also a reporter and consultant to the

11   Judicial Conference Advisory Board on the evidentiary rules.

12        So these two are charged with the duty of scouring the

13   nation's circuits to find trends, to bring cases to the advisory

14   council's attention to figure out how the laws and how the

15   rules, the evidentiary rules, should be tweaked.  And this *Law*

16   *Review* article addresses many of the concerns that we are

17   dealing with today.

18        So I would like to bring that to The Court's attention.

19   As The Court is aware, the Government is trying to bring in two

20   types of evidence:  A, which is evidence tending to show racial

21   animus against African Americans; B, evidence that Greg

22   McMichael equated African Americans with criminality.

23        I would like to focus, if I may, with The Court's

24   indulgence, on that second category first.  I agree with what

25   Ms. Copeland said earlier, that evidence equating African

1   Americans with criminality would perhaps be the most fertile

2   ground for relative evidence for the Government to prove its

3   case, but the evidence that the Government is trying to apply to

4   Greg McMichael in that category is this newsletter entitled

5   "Dixie Heritage" and I provided that to The Court under seal,

6   and the Government is alleging that Greg McMichael posted a link

7   on his Facebook to this newsletter and I provided that Facebook

8   record to show that there is no comment.  It is just the link,

9   but when you go to the link, to the *Dixie Heritage Newsletter*

10  and you print it out, you find out that it is 15 pages and it

11  contains articles, essays, advertisements, various

12  announcements.

13         When you take a look through the document, you will see

14  that there is an article from former actor and Georgia

15  Congressman Ben Jones defending what he terms Southern heritage,

16  an advertisement for an old-time gospel program, an article on

17  foreign policy and possible war in the Pacific, an advertisement

18  for a lawyer.

19         There's even a photo of a gentleman named H. K.

20  Edgerton, who is an African American, former NCAAP chapter

21  president, wearing a Confederate uniform because he supports

22  what he refers to also as Southern heritage, but contained

23  within this newsletter is an article about Woodstock in 1969.

24         It's comprised of 15 sentences, and it talks about,

25  according to the author, that because the majority of the people

39

1   who attended Woodstock were white and there was a low incidence

2   of crime that that would have been different if the majority of

3   people who attended Woodstock were black.

4          Now, of course, that's repugnant.  Of course, that is

5   vile.  The premise, the conclusion is reprehensible, but it's

6   also 15 sentences in length in this otherwise 15-page document,

7   and the problem for the Government in trying to admit this

8   document is three-fold:  One, the actual posting of the link

9   does not contain any type of commentary from Greg McMichael.

10  Doesn't say, "Hey, check out the article on Woodstock" or "I

11  couldn't believe, you know, if there were blacks there that

12  there would have been more crime."  It has nothing.  It is just

13  a link to the entire document.

14         The Government can't show what, if any, of these

15  articles or advertisements were read by Mr. McMichael, what did

16  he see?  Did he get past the headline and they can't show that

17  he certainly sympathized with, agreed with or espoused any of

18  the views, so the act that they're trying to show isn't just the

19  mere fact that he posted a link to this article; they are trying

20  to ascribe the premise that this one particular author did in

21  that 15-sentence article to Mr. McMichael, and that is the

22  evidence that the Government has in Category B against him.

23         It also has to fail because it fails under a 404(b)

24  analysis, and I do think this is all extrinsic evidence.  I

25  don't think any of this is intrinsic to the charged offenses.

40

1    It is extrinsic, especially when it is so far afield as this.

2         It has to be relevant to something other than the

3    character of the accused.  Number 2, it has to be established by

4    sufficient proof to show that the defendant committed it; and,

5    3, the probative value, as we know, can't be substantially

6    outweighed by the undue prejudice.

7         What is the evidence that the Government is trying to

8    show and for what purpose?  It doesn't go towards anything other

9    than character.  The Government is trying to make the connection

10   and have the jury make the connection that if somebody ascribes

11   to this view of criminality that they therefore are a bad person

12   and are more likely to act upon it.

13        That's a causal chain, that's an inference chain that

14   can't be followed.  One case that is instructive is *United*

15   *States versus Smith,* 725 F.3d 340, is a Third Circuit case from

16   2013.

17        In that case -- again, it's not hate crime case.  It's a

18   drug case, and actually in that case, the accused was charged

19   with pulling a weapon on a law enforcement officer, and what the

20   Government wanted to do is to have a prior conviction of the

21   accused come into evidence that, in that same area, he had been

22   convicted of dealing drugs and that he was protecting his turf.

23        That conviction was overturned because that evidence

24   came in.  Why?  Because the circuit court, the Third Circuit

25   said that the proponent must set forth a chain of logical

41

1    inferences, no link of which can be an inference that because he

2    committed the one offense, he committed this one, and I know

3    we're not talking about a conviction, but it does all fall under

4    404(b).  It's an action.  It's a deed.

5         So what we're left with is them trying to have this

6    causal chain that requires a juror to conclude he's posted this;

7    he believes this; therefore, he's likely to have done this.  You

8    can't get around that.

9         Secondly, established by sufficient proof, as I've said

10   before, the Government can't prove that he commented on it, that

11   he read it, he espoused it, that he believed it.  It's a 15-page

12   document containing those 15 sentences that the Government

13   wishes to cherry-pick.  So it fails for the second prong of 404,

14   and because there is such little probative value, clearly any

15   prejudice that would befall Mr. McMichael, if that were to come

16   in, outweighs the probative value because there's scant

17   probative value, so for all of those reasons, I think that

18   newsletter should not come into evidence.

19        THE COURT:  Let's talk about that last component of your

20   analysis.

21        MR. BALBO:  Yes, sir.

22        THE COURT:  The theory that has been advanced during

23   this hearing by the Government of the relevance of the racial

24   animus evidence and the criminality association is that it goes

25   to show exactly why this occurred, why the defendants carried

1   out this action.

2        Going through the 404 analysis and assessing the

3   probativeness versus the prejudice, the same question to you on

4   this piece of evidence that I put to Ms. Copeland.  How is the

5   prejudice that could arise here different from exactly what

6   theory the Government advances for probativeness and basically

7   that it would assign some prejudice because Mr. McMichael was

8   presumably embracing a racist ideology in this newsletter is

9   exactly why they think it's relevant?

10       MR. BALBO:  Your Honor, I would agree with you, and if

11  the Government could show that Mr. McMichael was embracing those

12  15 sentences, if they had evidence to show, "Hey, guys, look at

13  this article about Woodstock; I couldn't agree more with this,"

14  I would agree; they would be correct.  And that's why I do feel

15  that the evidence that a defendant equated race with

16  criminality, that would be probative for the Government.  I

17  think I would lose.

18       But the Government fails because they can't connect him

19  to those 15 sentences, so it fails on Prong 2, and because it

20  fails on Prong 2, it's so attenuated, Your Honor, that they

21  can't show it, that brings the probative value down so it can't

22  help but be overwhelmed by the prejudicial value.

23       I agree.  Those 15 sentences contain a sentiment that,

24  as I said, is vile and repugnant, saying that if these folks

25  were black, there would have been an increased amount of crime.

43

1   That's awful.

2          THE COURT:  Let me pose a hypothetical to you, Mr.

3   Balbo.  If your client had authored those statements and posted

4   them himself on his own Facebook account rather than embedded in

5   the newsletter, would that change your position?

6          MR. BALBO:  It would.  If Mr. McMichael actually was the

7   author of these 15 sentences, then the analysis would be

8   different because the Government would meet the second prong.

9   We would still need to see what theory they are putting it in:

10  Is it motive; is it intent?

11         I do think that that is grounds for challenge, but

12  certainly they would have made the second prong, and it would be

13  probative of his motive.  But that's not where we are.  That's

14  not what the Government has.

15         I respectfully again reiterate that I think that this

16  newsletter can't come in because the Government has failed to

17  meet its burden as to that.

18         Now what I would like to do is go Section A, evidence of

19  racial animus.

20         THE COURT:  Mr. Balbo, before you move on from that, on

21  the newsletter post, I just want to clarify, understanding that,

22  as the proponent of the evidence, the Government may have to

23  check off all those boxes, but I want to make sure that I

24  understand.  Is it your position that there is a dispute about

25  whether Mr. McMichael even posted the newsletter?

1          MR. BALBO:  No, Your Honor.  I am comfortable in that

2    the posting happened on Mr. McMichael's Facebook account and

3    that the link was posted.

4          THE COURT:  Okay, all right.

5          MR. BALBO:  Thank you, Your Honor.

6          Going to Section A, Category A, there's evidence of

7    general racial animus, and that breaks down along four different

8    lines, the first of which is testimony to be received from DC

9    and CN, former law enforcement officers that worked with Greg

10   McMichael.

11         Here we have a problem when we run this through the 404

12   analysis.  We have a temporal problem, Judge.  According to the

13   evidence provided to us in the form of 302's from the

14   Government, DC, a law enforcement officer, worked with Greg

15   McMichael from 1995 to 2005.

16         They worked approximately ten years from '95 to 2005.

17   The most recent time is 17 years ago, so it's between 17 to 27

18   years ago.  The cases I've seen in the Eleventh Circuit -- there

19   is no bright line rule, I would agree -- but usually 15 years

20   give or take a year or two is about the temporal distance that

21   courts usually will admit 404 evidence.

22         Here we were talking about 17 to 27 years.  When you

23   listen to the interview from DC, he talks in the recording that

24   he didn't even work that much with Greg.  They worked in

25   different counties, that the racial epithets, according to DC in

1    his recording, were made few and far between and were usually

2    jokes.

3          So, here again, it's reprehensible conduct, Judge.  I'm

4    not trying to say it is anything else.  Okay, to the extent

5    these comments are made and that's what the testimony is, no one

6    says that that's a good thing, but that makes it prejudicial,

7    unfairly, but the fact is because we're going back to 17 to 27

8    and we don't have much specificity as to how and when it was

9    used, other than it's few and far between and it was usually

10   jokes, that kind of lowers the probative value of the

11   statements, at least in my mind.

12         CN is the other law enforcement officer.  He worked with

13   Greg McMichael 1991 to 1993 and apparently 1994.  In his 302, he

14   references about eight to ten times in total he heard Greg

15   McMichael utter a racial epithet, and he said that those were

16   usually witnesses, perhaps suspects, maybe people who were

17   receiving subpoenas.  That is between 27 to 31 years ago, and

18   again I have not found -- I did find a case that had 17 years,

19   truth in lending; I did find one that had 17, but usually they

20   curtail it at 15 years.

21         Here we're talking about 27 to 31, so when you have a

22   temporal distance that great, I do believe that that lowers the

23   probative value of the evidence, and because it lowers the

24   probative value, I think when you get to the 403 balancing part

25   of the 404 inquiry, again, the undue prejudice overcomes

 1   whatever probative value there might be for a three-decade old

 2   comment.

 3        THE COURT:  This is often the challenge with 403

 4   analysis:  Does the decrease in probative value based on the

 5   temporal aspect decrease prejudice at the same time?

 6        MR. BALBO:  It does, Your Honor, and obviously I know

 7   you're going to review this conscientiously, but you would be

 8   the first one that I've seen to go back 27 years on one, Your

 9   Honor, so I would argue that that would not be proper and that

10   that balance skews in favor of keeping that out.

11        Testimony of CS, CS was a widow.  Her husband was killed

12   in a bad car accident in Glynn County, and there was going to be

13   a hearing in order to take her husband or her husband's killer

14   off of probation early, so she came down to testify.

15        So Greg McMichael, who worked at the DA's office, went

16   to go pick her up.  He brought her to court, took her to the

17   airport.

18        I don't have a recording of her statement.  All I do

19   have is the summary provided by the Government so we will deal

20   with that.  Apparently what CS says is that she, living in I

21   guess, Connecticut or New York, tried to bring up a little bit

22   of Georgia news.  She brought up the recent then passing of

23   Julian Bond, the civil rights activist, and she goes on to say

24   that it evoked some sort of rant, elicited a rant from Greg

25   McMichael, where he said that people like that just cause

1    trouble, that he said things derogatory about black people in

2    general, couldn't stand them.

3          I mean, for purposes of this hearing, I mean, she would

4    have an opportunity to be cross-examined.  It does strike me as

5    odd that someone who doesn't know her would go off on such a

6    tangent, but I'm dealing with the evidence as it is right now --

7    she would have to come in and talk about it -- but the fact is

8    it has a valid non-character reason to admit it.

9          So we're not talking about racial epithets.  We're

10   talking about general complaints about civil rights activists,

11   maybe some racial complaints about an entire community.  Again,

12   it is reprehensible; it is bad behavior; it is crude and

13   boorish.

14         But what is it probative of?  What does it show?  I

15   think it fails to meet the bar.  I think it is rather weak.  I

16   don't have much else to say about it, Judge, other than, you

17   know, it's -- I don't want to diminish it.  To the extent that

18   it has a racial component, it is bad, but at the same time, it

19   seems to be the rantings of a grouchy person.

20         THE COURT:  Mr. Balbo, respectfully separating that

21   statement into its constituent parts, there's a comment

22   responding to the Julian Bond death, but then the latter half of

23   that comment is --

24         MR. BALBO:  Yes, Your Honor, I agree.  I'm not trying to

25   minimize it.  I have not had a chance to review what she says.

48

1    I've only seen the 302.  I don't know if there exists a

2    recording.  So I'm on a little bit weaker ground here, I will

3    acknowledge, Judge.

4         I will move to Number 3, and I provided this in our

5    sealed filing.  I think this is just so far off the mark.  It's

6    the Irish meme.  It's a black-and-white photo that has a number

7    of young apparently white children, and it talks about the

8    plight of Irish in America.

9         It is crude.  The language used in the caption is crude,

10   but there is no evidence, first of all, that Mr. McMichael

11   created this meme, that this is something he generated through

12   some sort of software.  It was something that was posted.  But

13   there is no reference here to African Americans.  There is no

14   reference to any other minority other than the Irish and their

15   plight in America.  It's just not probative of anything.

16        THE COURT:  But Mr. Balbo, in fairness, looking at this

17   meme, the first sentence does reference other races.  It

18   expressly juxtaposes Irish immigrants' experience to other races

19   in the United States.  It includes an inherent racial component.

20        MR. BALBO:  One might argue that it's also

21   anti-immigrant, Judge.  I mean, I just -- what we're trying to

22   say here -- it sounds like the Government is trying to say this

23   is a crude, boorish posting.

24        Again, it could be anti-immigrant.  I guess if there was

25   a trial against that ethnic group, the Government would be

49

 1   trying to put it in, but it's a scatter-shot approach.

 2        Let's talk about this, Judge.  The Government, with near

 3   limitless resources, has scoured Mr. McMichael's social media,

 4   canvassed for people he's spoken to over three decades, and this

 5   is what they have got, this Irish meme.

 6        THE COURT:  Mr. Balbo, I want to, not to criticize your

 7   argument at all, but it sounds more like a jury argument about

 8   the weight of the evidence against your client, and I want to

 9   stay focused on navigating the specific rules of evidence that

10   are at issue here.

11        The theory is that there was a general racial animus

12   directed towards African Americans and that that was expressed

13   by Mr. McMichael, and this is a meme that relies on common and

14   unfortunately frequent racist tropes that it would be up to the

15   jury to assess.

16        MR. BALBO:  Well, Judge, I don't see that there's a

17   reference to African Americans or any other race other than the

18   Irish that are mentioned.  I understand by way of exclusion,

19   they're trying to set the Irish race -- it's an ethnicity --

20   against other people, but it, you know, the Government is the

21   proponent of this evidence.

22        They are trying to say that this is evidence to show

23   evidence of a racial animus that Mr. McMichael has against

24   African Americans.  I don't see African Americans listed here.

25   I think any ethnic group could be substituted in.

1          You know, the Government isn't trying to say this is

2     evidence of general racial animus against everybody or a pro-

3     white power.  That's not what they are saying.  They are saying

4     that that meme is anti-African American, and I respectfully

5     submit that I just don't see that there with what's there.

6          It also doesn't call for any type of violence.  It

7     doesn't call for any type of action against the African American

8     community.  Putting that into evidence would just simply be an

9     attempt to paint Mr. McMichael as a boorish, vile, generally

10    bigoted person, and that's the type of inference that 404 is to

11    keep out.

12         THE COURT:  That's the generally bigoted point, which is

13    that that connects to the theory of relevance here, is that it's

14    a racial animus generally.

15         MR. BALBO:  Well, Your Honor, again, the Government is

16    the proponent that this is evidence of racial animus against

17    African Americans.  The Government isn't saying, nor did they

18    put us on notice, your guy is a general bigot.

19         I mean, this comment, this meme that I have is also

20    misogynistic in some ways, so it allows a juror to look at this

21    and just say, "The guy is a jerk; the guy is crude."  And that's

22    precisely what 404 is intended to keep out.

23         Finally, Your Honor, moving to Number 4, LM, that's Mr.

24    McMichael's daughter, and basically the Government talked to

25    her, and when you look at the transcript, however, they ask her,

1   "Has your father ever used racial epithets," and she says yes.

2   She says, "I'm sure he has" or "I'm sure I have heard him do it"

3   but she can't pinpoint a specific time.

4        She also says it was done in a joking manner, and then

5   sometimes, when prompted by the Government, she said, "Well,

6   maybe sometimes it was angry," so we don't know when.  We don't

7   know when in her decades of life she heard this, so we have a

8   temporal problem.

9        We have the fact that she doesn't really know the

10   context that it was in.  The probative value of this for the

11   Government is again to show some sort of general bigoted

12   behavior against Mr. McMichael.  And, again, because there is no

13   time on it, I think that that hurts.  I think they have a

14   temporal problem.

15        I do have a couple of other points just to address some

16   of the cases that the Government pointed out, that -- and I

17   forget the name of the case.  It's the case where -- it was an

18   Eleventh Circuit case, where the district judge was threatened

19   by the individual who had the connection to ISIS.

20        This is really emblematic of a lot of the Government

21   cases and the argument.  When you actually go to the cases and

22   you peel them back and you start to actually look at what's

23   there, you see how it's very different from this case.

24        In that case, the evidence of the accused's affiliation

25   with ISIS was relevant because the threats that he made against

52

1   the judge was that he was going to strap a bomb to a drone and

2   have the judge hit.

3          The circuit court specifically said, "Looking at his

4   affiliation with ISIS and some of his posts that he put on there

5   showed that his threat to the district judge was not merely

6   hyperbolic speech, that he had the motive and perhaps the intent

7   to be able to follow through with his threat."

8          Again, there's more to it.  It's not just, oh, his

9   affiliation with ISIS comes in because it helps the Government

10  prove motive.  No, in the facts of that particular case -- and I

11  submit that's the way it is for many of these cases -- when you

12  actually look at them, you will see, well, there was a lot more

13  going on, and in this particular case that the Government cited,

14  it was to show that it was more than merely hyperbolic speech,

15  that he could have delivered what he was threatening.

16         THE COURT:  Mr. Balbo, I understand your

17  characterization of those cases, and to recharacterize it a

18  little bit, is that those don't provide a clear path for the

19  admissibility of this evidence because factually the

20  circumstances here are somewhat different.

21         What I don't hear, though, from the defendants generally

22  is that there is a legal foundation for the exclusion of this

23  evidence in the case law, and that's where I'd -- be most

24  interested to hear.  Other than general application of the

25  rules, is there a factual circumstance that is closely in line

53

1    with this case where it was excluded properly?

2         MR. BALBO:  The short answer is no.  When you look at

3    the cases, one of the other cases that came up was the Whitt

4    case.  That is 752 Federal Appx. 300, Sixth Circuit case, 2018.

5    That was the spray-painted Swastika case.  There were Facebook

6    messages and postings that were admitted into evidence but there

7    was also an earlier conviction for spray-painting Swastikas.

8         So that's again what I was saying, when you take a look

9    at these cases, yes, the court allowed some of the Facebook

10   evidence to come in, but you also had the prior conviction for

11   the same thing, so there was a lot more going on.

12        I will point back -- and this is in closing -- back to

13   the *Law Review* article that I mentioned.  There are what I would

14   consider a reemphasis on using 404(b) to do the gatekeeping.

15        What Professors Capra and Richter do, they do point to

16   circuits, particularly the Third, the Fourth and the Seventh

17   about focusing on this gatekeeping function.  The *Hall* case,

18   it's a drug case.  It is again not a hate case.  The *Hall* case,

19   Fourth Circuit, 858 F.3d 254, that was a case, it was a drug

20   case, which many of these are.

21        It was a case where there were drugs that were in the

22   defendant's bedroom and they wanted to show prior convictions

23   for possession with intent to distribute, and the circuit said

24   it should not have come in, and they talk about -- it's often

25   quoted and the Government quoted it and we see it in all the

54

1    cases, about Rule 404(b) being a rule of inclusion, not

2    exclusion.  The Fourth Circuit, which is -- it's the Fourth

3    Circuit.  It's a conservative circuit.

4         They say, in the *Hall* case, "Our characterization of

5    Rule 404(b) as a rule of inclusion reflects our determination

6    that the rules list of non-propensity uses of prior bad acts

7    evidence is not exhaustive," not that everything comes in, just

8    that, you know, we can't envision everything, but it doesn't

9    mean that it's a free-for-all, which brings me back to a line

10   that Ms. Copeland said in her response.

11        Just because 404(b) is out there and just because some

12   courts have viewed it as a rule of inclusion, it's not a

13   free-for-all.  This Court serves a very important function to

14   keep out that propensity evidence.

15        There cannot be that inference, this logical chain, that

16   goes from one incident to another, if it involves an inference

17   that a person committed a crime because he's a bad guy, because

18   he has a propensity to do so, and I think that the evidence that

19   the Government is trying to put in does that.

20        THE COURT:  Thank you, Mr. Balbo.

21        MS. COPELAND:  Your Honor, my client requires a comfort

22   break.  Can we have a short recess?

23        THE COURT:  We will.  We will take approximately a

24   five-minute recess, and we will remain in closed proceedings

25   when we return to the courtroom, and all of this will remain

55

 1    under seal under I order otherwise.  We will be in recess.

 2                 (Recess from 11:25 a.m. to 11:38 a.m.)

 3         THE COURT:  All right, before the break, Mr. Balbo, on

 4    behalf of Mr. Greg McMichael, concluded his presentation, and we

 5    were about to hear from Mr. Theodocion.  Mr. Theodocion, ready

 6    to proceed?

 7         MR. THEODOCION:  Yes, sir, Judge.  I didn't mean to be

 8    presumptuous coming up to the podium in advance of Your Honor.

 9         You know, Judge, we all know, obviously, this is -- you

10    know, obviously the evidence we're dealing with is the most

11    incendiary imaginable, and we take such pains in most cases to

12    avoid anything remotely close to this.

13         We don't allow a defendant to have a photograph with a

14    Confederate flag on his shirt because we know that it's

15    difficult for jurors, particularly black jurors, to listen and

16    see and hear this type of evidence and then still manage, with

17    all due respect to a well-crafted jury charge, manage to look at

18    the defendants through an unbiased lens, and so even though --

19    of course, with a case like this, we know what we're getting

20    into.

21         We know there's actual essential elements in these

22    counts, a racial element, so we know that this is a different

23    type of case, but we still need to rely on The Court's

24    gatekeeping authority in some capacities, and so I wanted to,

25    you know -- obviously I've objected to all the evidence sought

56

1    to be brought in under Categories A and B, but I wanted to --
2    but, again, I realize the case law.  And we all do, and we all
3    know this a different case and we all know this is one of those
4    cases where a person's opinion on, say, interracial marriage
5    would usually be admitted, but I do want to focus on some of
6    these matters, Your Honor.
7          Specifically I want to focus, under relevancy under 401
8    and 402 and then 403, The Court's gatekeeping powers dealing
9    with prejudice as it relates to probative nature, and what I
10   want to address first, Judge, is regarding the general racial
11   animus, and as you know, the evidence against Roddie Bryan is
12   basically, almost all of it, is his dislike of this one
13   particular young man who was dating his adopted daughter, and
14   there are various comments, usually texts with his ex-wife,
15   where he makes, you know, obviously unfortunate racial slurs
16   from the worst to the euphemistic, but I want to focus on three
17   right now, Judge.
18         One is a text exchange, and this is, all three of these
19   were noted in Part 1 Number 4 of my motion.  In the Government's
20   motion, they are on Page 9 starting off with a February 22nd,
21   2020 text exchange between Roddie and his ex-wife.
22         This was at Government Bates 74289, and this text
23   exchange --  and I will just read -- "Bryan's ex-wife joked with
24   him over text about whether he was going to fly down to Costa
25   Rica with their daughter and her African American boyfriend,

1    whom she jokingly referred to as Bryan's future son-in-law;

2    Bryan responded, referring to the boyfriend, 'He'd fit right in

3    with the monkeys'," and that is what it is, and we're probably

4    just going to have to deal with that, Judge, but after that --

5    this is text exchange -- after that, then she has a response

6    that he doesn't respond to.  She responds "I guess she really

7    wanted to be done with me; this is the only thing I've always

8    said I could never accept," so what this is is a statement of a

9    mother saying, "The only thing I could not accept in my daughter

10   is if she dates a black man," okay.

11        Roddie does not respond to it.  He does not give it a

12   thumbs up.  He does not agree with it.  That's it, and so when

13   we look at what's relevant evidence and what isn't, what fact of

14   consequence is more or less likely, probable, than it would be

15   without this statement when we're talking about the opinion of

16   his ex-wife in Costa Rica, her opinion on her daughter and

17   interracial relationships.

18        That's not relevant evidence to this case.  It's not

19   probative at all.  We know it's prejudicial.  It's just one more

20   person that hates black people.  Not only Roddie Bryan calls

21   them monkeys, but, hey, his ex-wife who lives in Costa Rica,

22   it's the worst thing, in her mind, it's the worst thing a child

23   can do, and so our position, Judge, is this is not relevant

24   evidence.

25        It should not come in that woman's opinion on

1    interracial relationships, an opinion that Roddie does not give

2    any sort of agreement with or consent to in this particular

3    exchange, that that should not be allowed because we know all

4    this stuff is prejudicial.

5         The only question is is it probative and is the

6    prejudice, you know, part of the probative nature of it.  This

7    is not probative.  Her opinion, her statement, to him is not

8    probative, and again, you know, sometimes we talk, when we're

9    talking about this evidence, there is something that is direct

10   and clear and life is not so easy for the Government.

11        It would be great if, you know, when we're talking about

12   a text message from Roddie "I don't like black people; I don't

13   agree with black people and white" -- you know, those type of

14   direct, clear indications of mindset, but the problem is when we

15   take bits and pieces of evidence that do require extrapolation,

16   how far are we willing to go, right?  If he has a neighbor that

17   flies a Confederate flag in the front yard, the fact that Roddie

18   doesn't go over there and take it down, obviously that would be

19   too far, and I would submit that this is too far, that a

20   statement made by his ex-wife to him that he does not respond to

21   is too far.  That's not indicative, that's not relevant, it's

22   not probative as to his mindset on this day or any other day.

23        Then going on to the next item, Judge, again Part 1,

24   Number 4, in my brief, the exchange noted at US Bates 74293,

25   this is probably, maybe the worst of all the evidence sought to

1    be introduced in this case.

2            This is another text exchange where Roddie's text,

3    "Hey" -- and again they are kind of referring back to the

4    conversation about the -- about the daughter who had a lot going

5    on in her life, not only the boyfriend.

6            Roddie says, "Hey, I kind of read all this yesterday but

7    had a very eventful day around here."

8            Now, this is the day after the shooting.  "Had a very

9    eventful day around here so could not really process it, but it

10   sounds like she don't give an F what you think."

11           Bryan's ex-wife replied, "There is definitely signs of a

12   sociopath; she has no conscience or regard for others; I'm so

13   hurt by her lack of concern; I mean, how long has she been so in

14   love with this dude that she shuns her family."

15           So that's a conversation about the daughter, okay.

16   Roddie's only contribution to this conversation is, "Hey, I

17   couldn't really get to it yesterday but it sounds like your

18   daughter doesn't really care what you think."

19           Now, again, is this relative?  Is this probative?  Does

20   that statement in itself make any consequential fact more or

21   less likely?

22           It's hard to imagine that -- I mean, that's -- but it

23   gets way worse, of course.  This is the part that we have the

24   most objection with, and this is all from his ex-wife.  None of

25   this comes from Roddie.

60

1        She says, her text, "Big shootout at Satilla Shores,

2   huh?  When I saw the person shot to death in Satilla Shores I

3   assumed your introduction to your son-in-law didn't go so well,

4   LOL."

5        So here we have his ex-wife making a crude joke about

6   the very murder of Ahmaud Arbery.  That's maybe the worst thing

7   of all the items sought to be introduced, mocking the fact that

8   this young man is dead and making a joke.  It's clearly a joke.

9   Right?  It's a joke in horrific taste.

10       Roddie doesn't respond to that, and, again, you know, is

11  this relevant?  Can you get this in under 404 or 402?  What is

12  the relevance?  Her joke to him that he does not respond to,

13  this is not relevant evidence in this case.  We know it's

14  extremely prejudicial; right?

15       But how -- I don't see the probative nature of this,

16  someone else's comment.  It was clearly a joke; right?  She

17  clearly didn't -- I mean, capital LOL, she's not saying "Oh, I

18  really thought you killed this young man."

19       It's a joke in horrific taste.  It would be insulting to

20  any juror, you know, that someone would make fun of this

21  situation, and it's not coming from Roddie, and so we don't feel

22  it's relevant.  We don't think it's admissible because we can't

23  just go -- as I said, the extrapolation in a case like this, we

24  understand the Government has some breadth in its presentation

25  that they ordinarily wouldn't and as Your Honor has accurately

1   pointed out, a lot of these comments we could make on some of

2   these things was Roddie, did he not like the young man because

3   he was black or because of other things in the young man's life?

4   Those are things that you could arguably say, "Hey, you have to

5   take that to a jury and let them make that determination," but

6   not when we're talking about the two things I just mentioned,

7   the fact that his ex-wife is so adamantly against interracial

8   marriage and the fact that she made this horrific misplaced joke

9   regarding Mr. Arbery's death.

10          THE COURT:  Mr. Theodocion, let me ask you this:  On

11   this exchange and Mr. Bryan's ex-wife's response, what is your

12   precise articulation of the prejudice that this would create

13   here?

14          MR. THEODOCION:  With regard to the February 24th or

15   both?

16          THE COURT:  Both.

17          MR. THEODOCION:  Well, Judge, the prejudice is it's a

18   person who he was married to who he is still in communication

19   with and she is mocking the death of Ahmaud Arbery, mocking it,

20   and there has to be some probative value to evidence, regardless

21   of the prejudice, and another person's opinion or another

22   person's joke is not relevant to the facts of this case.

23          You know, whether or not Roddie had animus against

24   African Americans, is it more or less likely based upon a joke

25   that his ex-wife gave?

1    It's hard to see, and again, we know it's incendiary.

2    It's the worst.  It is someone making a mockery of this young

3    man's death.  Our position is it's not relevant what her --

4    however many jokes she's made.

5        If the Government went to her Facebook account and found

6    30 more jokes, they similarly would not be relevant.  Again it's

7    nothing that Roddie approved.  He didn't laugh at the joke.

8        Of course, the Government said in its brief there's a

9    difference between laughing at jokes and showing and having

10   conduct and making expressions that show, you know, a disdain or

11   animus towards another.  We don't have that here.  We don't have

12   any of that here.

13       THE COURT:  On the relevance side, though, Mr.

14   Theodocion, I think the Government would argue that you've got

15   comments before, the day before the incident, where Mr. Bryan

16   expresses racist viewpoints.

17       The incident occurs on the 23rd and then immediately

18   after his ex-wife is continuing a dialog that connects racist

19   concepts with the boyfriend of the daughter and now with the

20   victim in this case and that that goes to demonstrate Mr.

21   Bryan's mindset on the intervening day in between those two

22   comments.

23       MR. THEODOCION:  I think I would say regarding the

24   February -- and these are all part of exchanges that are

25   constantly going on regarding the daughter, but with regard to

63

1    the exchange on the 22nd, Your Honor, limiting to what was said

2    on that day, I will concede there's a big difference between

3    what Roddie said, ending with "He would fit right in with the

4    monkeys"; right?

5           That's one thing but the last bit of that exchange after

6    he was -- after his last text, her response, her opinion about

7    her position on interracial marriage, which is the most absolute

8    position I can imagine; right?  She says, "As a mother,"

9    capital, "the only thing I could never accept" from her daughter

10   is dating a black man, and so my position is that her opinion,

11   again an opinion that he hasn't -- you know, that extreme

12   opinion is not relevant.  You know, that's her opinion.  That's

13   not Roddie Bryan's opinion, and the same thing with regard to

14   the February 24th.  She made a joke about that.  Roddie did not

15   exchange, on the 24th, Roddie did not engage in any racial

16   exchange.

17          The only thing he said "Hey, the stuff we were reading

18   the other day, it just sounds like she don't give an F what you

19   think."  That's the extent of what he said.

20          You know, she doesn't care what her mom thinks about who

21   she's dating.  That's a common thought process for young people.

22   Roddie does not engage in any sort of racial commentary or

23   conversation.  He just says, "Hey, yesterday was a big day; I

24   didn't have a chance to look at that stuff from the other; it

25   just sounds like she don't care what you think."

64

1       Right?  That's the extent.  He's not going back and

2   engaging regarding race, and then just really out of nowhere --

3   I mean, he does mention it was an eventful day, but out of

4   nowhere, she makes that just grotesque joke and makes a mockery

5   out of Mr. Arbery's death, and I can't see how that should be --

6   any implication on Roddie should come from that really

7   classless, moronic joke that his ex-wife made.

8       And now, Judge, kind of going on to the other two things

9   I wanted to mention, and these go to the category feeling that

10  there's criminality among African Americans, and I want to focus

11  on two exchanges.

12      Again we've objected to all of them but I don't want to

13  come here and beat my head against the wall.  So I want to try

14  to focus on just a few things, and I want to go through Part 2

15  of my motions Numbers 1 and 2, and these things are addressed on

16  Page 11 of the Government's motion, and they would be October

17  10th, 2016, a Facebook comment and then a May 21st, 2019 text

18  exchange.

19      Starting back on October 10th, 2016, this was USA Bates

20  74256 and 74262, in response to a post from a Facebook friend

21  announcing that the police had recovered her husband's dirt bike

22  and arrested a suspect, Roddie posted the comment, "What kind of

23  fine, upstanding citizen was it?  My money is still on" and he

24  makes a racial trope as indicated.  No need in me repeating it.

25      That's one crime, a singular crime.  As you can tell by

1   the fact that we're back in 2016 -- and Your Honor knows how

2   Facebook subpoenas work.

3        My client voluntarily gave over his phone at some point.

4   All his text messages, all his Facebook posts and comments, the

5   exchanges with his ex-wife were done on a texting app WhatsApp.

6   All these things were pored over, and with Roddie, we have seven

7   instances of the N-word being used total, and this is the only

8   time he ever responded regarding a crime; right?  Didn't chime

9   in on Ferguson, didn't chime in on George Zimmerman and Trayvon

10  Martin about blacks.

11       But this one particular specific case where a friend had

12  had a dirt bike found, arrested the suspect, he made the comment

13  that he was betting on the fact that it was an African American;

14  right?  This one particular case.

15       Now, at some point people are allowed to, based on their

16  own experiences, have some type of commentary.  If I was on the

17  way back to the office and I got a text message that I had two

18  clients coming in tomorrow, a federal drug-trafficking case and

19  a federal child pornography case, if you asked me, based on my

20  experience, based on the mathematics of my practice, I would

21  think, well, most likely in the drug trafficking it's going to a

22  be a younger African American male; in the child pornography

23  case, it's going to be a slightly older white male.

24       I don't think black people are more inclined to commit

25  drug offenses than white people; I don't think white people are

1   more inclined to commit child pornography offenses than any

2   other race, but I do know for a variety of reasons that's how

3   the math tends to work out, at least in my practice and what I

4   see; right?

5          I'm allowed to make that statement.  I'm allowed to take

6   my experience and say, "Well, that's -- the odds are there."

7   It's just factual.

8          If I get hired on a violent crime case, it's almost

9   always a male.  Do I think that men are inherently more violent

10  than women -- well, that's probably a bad example, but what I'm

11  saying is we're allowed to make those comments as long as it's

12  not something that has kind of an overriding thematic, you know,

13  kind of evil to it.

14         This is a singular crime, not that African Americans

15  tend to be criminals, but just in this one case is "I bet it was

16  a black person that stole that bike," you know, and so we would

17  argue that that doesn't show -- again maybe that's something

18  more prone to speak to a jury, I understand, but that would be

19  our position, and then also, Judge, then regarding the May the

20  1st, 2019 text exchange -- and this is at Bates 74286 -- a

21  friend texts Roddie that his wife is on life support, and Roddie

22  makes, you know, kind of comments that, hey, you know, if he was

23  black he wouldn't pay for it and try to get her on the

24  disability like the blacks that don't need it.

25         Again, the Government suggests this is indicative of his

1    feeling that blacks are inclined to be -- associating them with

2    criminality.  It's not a crime he's even bringing up, you know.

3    Not paying bills and getting on social programs, you know,

4    that's not criminal.  You know, again, a person is allowed to

5    have an opinion as to how big of a safety net we have, how high

6    that net should be.

7         I feel that farmers get more money than they should from

8    the United States Government.  That doesn't mean I dislike

9    farmers or I think farmers are crooks.  It just means if I was

10   pushing the buttons in Washington, D.C., I would probably adjust

11   it and not give out so much money to farmers.

12        Again, a person is allowed to think that disability,

13   that Medicare, et cetera, is too broad and is taken advantage of

14   too much without necessarily showing -- without the implication

15   being that he associates African Americans with criminality or

16   that he has any animus towards them.

17        Again, it's when we start -- we understand if you make

18   a -- if you use the N-word, if you call an African American a

19   monkey, if you say that blacks and whites shouldn't date, well,

20   that's just evidence that we're probably going to have to live

21   with in front of this jury, and we're going to have to deal with

22   it as defendants.  We understand that in this type of case.

23        It's when we take evidence and we just extrapolate it

24   and we just widen it out.  The orbit is too far.  In this

25   particular case, he held the opinion that black people get more

1     social programs from the Government.

2         He's not blaming black people for the ills of society or

3 his ills or anything else.  He's certainly not suggesting they

4 are criminals because they take advantage of legal government

5 programs, and so we would suggest, with regard to those two

6 things, again, it's all prejudicial.  The question is:  Is it

7 probative or not?  Is it relevant?  Do these things help prove

8 or disprove consequential facts, and for those reasons, Judge,

9 we don't think those various exchanges are appropriate either.

10         THE COURT:  Thank you, Mr. Theodocion.

11         MR. THEODOCION:  Yes, Your Honor.

12         THE COURT:  Mr. Perras, any rebuttal?

13         MR. PERRAS:  Thank you, Your Honor.

14         I wanted to briefly respond to a couple of the big-

15 picture points that Ms. Copeland made and get into the specific

16 posts referenced with respect to Ms. Copeland's argument about

17 making a clear distinction between motive and intent.

18         Your Honor, it's the Government's position that motive,

19 intent, racial animus, discriminatory beliefs, these are all

20 words to describe the same thing in the case law.  The

21 Government did not take a position in its brief that we're only

22 seeking to introduce this evidence as probative of this one type

23 of thing.  It's all really the same thing in a hate crime.

24 Motive, intent, discriminatory animus, racial animus, it's all

25 the same thing.

1          MR. BALBO:  Excuse me, Your Honor, not to interrupt but

2   my client says he's having difficulty hearing Mr. Perras.

3          THE COURT:  Pull the microphone a little closer.

4          MR. PERRAS:  Sorry about that.  The second point I want

5   to make is Ms. Copeland talked about the substantial similarity

6   requirement.  I want to make a couple of points about that.

7          First, there was a lot of evidence in Travis McMichael's

8   Facebook account of his racial animus against other racial

9   groups.  For example, there was a post where somebody posted a

10  meme of the Hiroshima atom bomb explosion and the defendant

11  posted back "sayonara, you slant-eyed F's."  Extreme racial

12  animus against another group.

13         We're not seeking to offer that because it's not similar

14  enough here where the victim is African American.  I would also

15  point out there is no similarity requirement in the case law in

16  all of the racial evidence hate crime cases.

17         So if you look at all those cases cited in Government's

18  Footnotes 9 through 11, there is no case that says to be

19  admissible as racial animus evidence, it has to be similar to

20  the charged case.

21         The substantial similarity requirement Ms. Copeland

22  mentions arises out of the 404(b) context, and the purpose of

23  that rule is to require that if the Government is putting on

24  evidence of a prior bad act and wants the jury to infer from

25  that act the defendant had the same motive or intent then that

1   he did in the charged incident, it makes sense that that prior

2   bad act be similar in nature to the charged act, but here there

3   is no sort of chain of inferences required because we have the

4   defendants' own statements expressing their own racial views.

5          The next thing I would like to turn to is the Trayvon

6   Martin post.  Ms. Copeland stated that similarity is required.

7   Well, it's hard to imagine a more similar context than the

8   Trayvon Martin case.  That is a case where there is a black man

9   in a predominantly white neighborhood, a young black man.  A

10  neighbor regards him as suspicious.  The neighbor comes outside,

11  confronts him.  There is a struggle, and ultimately at the

12  conclusion of the struggle, the neighbor shoots and kills the

13  young black man.  Very similar to the facts of this case.

14         And the defendant's comment about that case isn't just

15  he sided with one side or the other.  It showed utter contempt

16  for the murder, even for the death, if you don't view it as a

17  murder of Trayvon Martin, and it undercuts his expression of

18  remorse to the Glynn County police officers immediately after

19  the crime.  The jury is going to be asked to determine whether

20  he is being credible in his statements to police expressing that

21  he wished he didn't have to do that.

22         The fact that he had previously laughed and joked about

23  the death of a black man in a similar situation undercuts that

24  credibility.

25         Ms. Copeland stated that there is no evidence that the

71

1    defendant ever assaulted a black person or associated with

2    racist organizations.  That is not true.

3           During the Government's investigation, the Government

4    recovered evidence of multiple incidents that were racially

5    charged, one incident in which the defendant punched a black

6    person in the face.

7           We also uncovered evidence of both Greg McMichael and

8    Travis McMichael's association with an organization, Identity

9    Dixie, which has been labeled as a hate group.

10          The Government is not seeking to introduce evidence of

11   either of those incidents because the Government was not

12   convinced that the evidence was credible enough in both cases,

13   and so we're not seeking to introduce that evidence, but I did

14   want to correct the record.  There is evidence of assault, of a

15   prior assault.  There is an evidence of association with racist

16   organizations but neither of those things was a requirement.

17          In the early hate crimes cases in the eighties and early

18   nineties, oftentimes the defendant associated with the Klan and

19   other groups.  In more modern case, you see that less often.

20   There are no formal Klan meetings or very, very few these days.

21          These days more often you see individuals who become

22   either radicalized in their social group or online.  Ms.

23   Copeland talked about a post involving a Black Lives Matter

24   protest, and I did want to correct the record on that.

25          That begins with Travis McMichael personally posting a

1  link to a video of several black women being run over by a car

2  and then comments, "Are you late to soccer practice?  Mash it --

3  protesters blocking your way?  Mash it and drive straight."

4        With respect to the Dixville post, I do think that Ms.

5  Copeland raised a fair point about the chain of inferences

6  required for that to have probative value.  In other words,

7  there has to be some evidence that Dixville, that the people

8  that the defendant is talking about were black.

9        There is some evidence in this case, though, so for one

10  thing, Dixville isn't just any neighborhood.  It is a historic

11  place in Brunswick, and it is a historic place recognized as the

12  first place in Brunswick that was developed by formerly enslaved

13  people, so there is a racial connotation to Dixville itself, and

14  that connotation was also not lost on folks who viewed his post,

15  including one person, BD, a Facebook user who commented on

16  Travis McMichael's post -- and BD is African American, and he

17  commented, "Don't bash my kinfolk."

18        So it was evident to him what Travis McMichael was

19  talking about, but she makes a fair point about the chain of

20  inferences required in that particular example, and so

21  there's -- I would agree with Mr. Balbo, too, regarding the

22  *Dixie Heritage Newsletter*.

23        So that's another one that it's not contested that

24  Gregory McMichael shared with all his Facebook friends this

25  newsletter including this article equating African Americans

73

1   with criminality.

2          But he's correct in pointing out he doesn't add any

3   commentary to it, and so we would -- the Government at this

4   point would not move to admit that particular post because of

5   the linkage issue.

6          THE COURT:  That goes to the Dixville post and for the

7   newsletter?

8          MR. PERRAS:  Just the newsletter, Your Honor.  We

9   believe with the Dixville post there is sufficient linkage, both

10  the connotation of the Dixville neighborhood -- it's recognized

11  as a place of historical value for African Americans in

12  Brunswick, the fact that a fellow commenter recognized it as

13  such and recognized is as an attack on black people, and the

14  fact that, as Your Honor pointed out, there's another very

15  similar post he makes, very similar language talking about

16  blacks leeching off the Government, so for that reason, Your

17  Honor, we believe that there is sufficient linkage in that

18  particular post.

19         Getting to then Mr. Gregory McMichael's arguments, so

20  Mr. Balbo conceded with respect to the *Dixie Heritage Newsletter*

21  that if Greg McMichael was the author of the racial views in

22  that newsletter, of course, they'd be relevant and probative.

23         Well, the witness testimony we're talking about, Greg

24  McMichael is the author of his own views.  He's the one making

25  these statements, using the N-word, calling black people thugs,

1    criminals, associating them with crime.

2         With respect to the temporal kind of challenge Mr. Balbo

3    makes, that the comments to fellow law enforcement officers back

4    in the nineties, when he was working at the Glynn County

5    District Attorney's Office, it's just too far back to rely on.

6    So a couple of comments on that.

7         I believe, if all we had were those sort of long-ago

8    statements, it is certainly possible that the defendant could

9    have changed his mind and turned over a new leaf and had a

10   different attitude towards black people, but we know that's not

11   true because of the testimony by CS regarding Julian Bond.  That

12   was in 2018.  That was just a couple years ago, and it's very

13   clear from that particular witness' testimony that he held

14   strong racial views there, talked about he wishes he could get

15   rid of all of them because blacks are nothing but trouble.

16        The witness stated in her interview that the reason this

17   stuck out to her is because she was -- she actually got a little

18   scared that she would -- if she disagreed so she stayed silent.

19        This really stuck out to this witness.  Your Honor, we

20   would point out we received a lot of tips about different things

21   these men have said and done over the years.  We are only

22   putting forth testimony from witnesses who we have determined to

23   be credible, law enforcement officers, this particular witness.

24   There's other stuff out there that we're not putting on.

25        We would also point out that, at this point, we don't

1    plan to put on Lindsey or the -- LM, the defendant's daughter

2    just for optics reason, calling the daughter and sister of the

3    defendants.  It's not our intent to do that, but if there is any

4    argument that the defendant did not actually hold these racial

5    views, his own daughter has testified that he did.

6         THE COURT:  Mr. Perras, you're saying you don't have a

7    present intent to put on that witness.  You still are seeking a

8    pretrial ruling on the admissibility of that testimony, though?

9         MR. PERRAS:  Yes, Your Honor, just because we can't

10   anticipate what the theory of the case for Defense will be in

11   oral argument, what arguments they may make with witnesses.  At

12   this time, it's not our intent to put her on, but if we would

13   need to put her on to rebut something that was said, we want to

14   reserve the right to do that.

15        So, Your Honor, the last thing I wanted to address is

16   the arguments by Mr. Theodocion.

17        THE COURT:  Before you get to that point, do you have

18   any additional comments on the argument made by Mr. Balbo

19   related to the Irish immigrant meme?  There was an argument that

20   it was going to generate some additional prejudice in the form

21   of it being sort of an indicator of being an unpleasant or

22   difficult person that had elements of misogyny in it, plus there

23   was not any express reference to African Americans, and, just to

24   hearken back to your earlier arguments, you've explained as to

25   Mr. Travis McMichael you've not sought to admit evidence that

1  could relate to other racism.  Here with this, it's vague as to

2  what other races are being referenced.

3       MR. PERRAS:  Yes, Your Honor.  So with respect to the

4  misogynistic point, it's clear to me from reading this post that

5  the point is not to be misogynistic.  He throws out the word,

6  quote, pussies, but clearly his anger is not with women.  It's

7  with a particular racial group, which it seems is inherent in or

8  is implied in this meme.

9       I mean, he's talking about white Irish slaves were

10  treated worse than any other race in the United States.  Well,

11  the other race in the United States that was enslaved was black

12  people, and then he talks about "When was the last time you

13  heard an Irishman bitching about how the world owes them a

14  living?  You won't.  Irish are not P words looking for free

15  shit."

16       And it's all in a piece with the racial resentment you

17  see with Travis McMichael and Gregory, not just that they have

18  certain racial views but that they are angry about it.

19       So, for example, on Greg McMichael, on his Facebook

20  page, he posted a meme of Representative Maxine Waters.  There's

21  a photograph of her.  She's African American and made a comment

22  about her being on "Sanford & Son."

23       It's an offensive, distasteful, racial comment, had

24  nothing to do with anything but her race.  The Government is not

25  admitting that.  They are not offering that because it's not

1  particularly probative of racial animus.  It's a dumb, offensive

2  thing.

3          This here, this post inherent in it is a degree of anger

4  and resentment that "I come from white Irish background; we were

5  treated poorly; we don't bitch about it; we're not looking for

6  handouts so we're tired of these black people doing the same

7  things," so that's why we're offering that particular post, Your

8  Honor.

9          With respect to Mr. Theodocion's arguments about Roddie

10 Bryan, start first with the conversation about the daughter's

11 boyfriend, shortly before the shooting.  Your Honor, we're

12 offering sort of all of this conversation for two reasons.

13         One is context.  It's an ongoing dialog between Roddie

14 Bryan and his ex-wife about their daughter and who she is

15 dating.  It begins with the comment the defendant himself makes

16 over the phone, quote, going to be an N-word lover just like her

17 momma, right?  He finds she's dating a black person and he's

18 angry about it.

19         That dialog continues a lot over the next days and

20 months.  I mean, it's constant with WhatsApp phone calls,

21 WhatsApp text messages.  And rather than just put Mr. Bryan's

22 statements, which you can't really understand without that

23 context, we include the statements of his ex-wife.

24         And then I would also point out, Your Honor, that Mr.

25 Bryan's silence speaks volumes here, so with respect to the

78

1    first statement, "I guess she never wanted" -- "I guess she

2    really wanted to be done with me; this is the only thing I said

3    I never could accept."

4           Mr. Bryan doesn't say, "What are you talking about; this

5    is our daughter; how could you say that?"  I mean, it's part of

6    an ongoing conversation which it's clear from his first

7    statement in that conversation and his last statement in the

8    conversation that he agrees with what she's saying.  He is

9    adopting what she's saying and her statements provide necessary

10   context to understand what he means by his later statements,

11   "Like I said, she don't give an F about herself; why should we;

12   I don't see any way anything good can come to her with the life

13   she's leading."

14          When you look at the entire conversation, they are not

15   talking about bad things their daughter is doing with this

16   boyfriend.  They are not talking about anything negative about

17   him.  They are talking about his race.  And so we're offering

18   all of this as context for an ongoing dialog.

19          Your Honor, the last thing that Mr. Theodocion

20   referenced was the two comments, one about the stolen dirt bike.

21          THE COURT:  I want to go back, Mr. Perras, in that text

22   message exchange with the ex-wife, focus specifically on the

23   portion of the February 24th exchange.  Mr. Theodocion focused

24   largely on the ending portion of that exchange starting with

25   "Big shoot-out at Satilla Shores" and his argument was that Mr.

1    Bryan's ex-wife's statements were extremely inflammatory,

2    prejudicial to his client and don't really bear on Mr. Bryan

3    personally in terms of his view or assessment of the incident

4    that happened the day before and that his lack of a response to

5    that isn't any indicator of approval or acquiescence to her

6    comment there.

7         I think you agree, Mr. Perras, that comment viewed in

8    this context would probably be inflammatory and so can you speak

9    to the probative value of that comment?

10        MR. PERRAS:  I agree.  I think he makes a fair point

11   with respect to that particular one sentence starting with "Big

12   shoot-out at Satilla Shores."

13        We included all of this in here so the jury had a proper

14   context for understanding Mr. Bryan's statement in this ongoing

15   conversation.  I agree with Your Honor.  And I agree with Mr.

16   Theodocion that that one last statement in there is clearly

17   meant to be a joke, and it doesn't necessarily reflect Mr.

18   Bryan's views.

19        He didn't say anything in response to it, so he didn't

20   say, "Come on, that's completely inappropriate; can't talk about

21   a dead guy that way," but this is not something -- I think it

22   would be reasonable to redact that part out as long as the rest

23   of it is in there to really give full context of what this

24   conversation is about, what his responses mean in the context of

25   what she's saying.

80

1      THE COURT:  We will move into the last comments and

2  those related to the -- I believe the dirt bike theft and the

3  payment of medical expenses.

4      MR. PERRAS:  Yeah, so start with the medical expenses

5  comment.  This really struck me reviewing this evidence.  It

6  actually starts out with a voicemail from his friend talking

7  about how his wife is on life support in the hospital, and it's

8  not -- it's clearly not a joke.

9      It's a thing that's happening, and then they have a text

10  message conversation about it, and there's no reference to black

11  people.  There's no racial valance at all to this, and he just

12  starts making inflammatory comments against black people out of

13  nowhere.

14      It really reminded me of Travis McMichael's text message

15  exchange where he talks about his new job, and then out of

16  nowhere, he says, you know, "I love it because there is no

17  N-words working with me."  He really shows a depth of racial

18  animus there.

19      Mr. Theodocion talked about how it has nothing to do

20  with crime.  I mean, disability fraud, he says, recommends that

21  he tries to get his wife on disability like the N-words that

22  don't need it.  That is an association of black people with

23  crime, but it's actually the dirt bike post, to me, is one of

24  the more probative ones here because it's very similar to the

25  situation that Mr. Bryan found himself in on the day of the

81

1   shooting.

2          He, in the actual dirt bike situation, there's a crime

3   that happened and he knows nothing about it, and he just assumes

4   that a black person did it.  Similarly, he hears there are

5   thefts in the neighborhood.  He sees a black man and two white

6   men.  Just assumes the black guy must be the guy that does

7   something wrong.

8          So I think that's particularly probative of sort of why

9   he acted in the way he did on the day in question.

10         Mr. Theodocion said, you know, Mr. Bryan didn't chime in

11  on Ferguson, Trayvon Martin, in all of his text exchanges.  For

12  the record, that is not the case.  There are several text

13  exchanges and on Facebook where he talks about black protests,

14  black riots, complaints about how they are keeping him from --

15  keeping him from getting to a concert on time.

16         We're not seeking to introduce those pieces of evidence

17  because, again, they don't really go to the extreme racial

18  animus or racial assumptions, but I did want to correct the

19  record that those are on there.

20         I don't know the impression to be had out there that the

21  posts offered by the Government, the texts offered by the

22  Government, is the only things we could find in all of the

23  defendants' social media accounts and in texts.  There's a lot

24  of other stuff.  We really just preened it down to the stuff

25  that we believe is most relevant to the racial aspect of this

82

1   case.

2          THE COURT:  Thank you, Mr. Perras.  Counsel for the

3   Government, is there anything we need to address in this closed

4   session or anything we need to address in an open session today?

5          MS. BERNSTEIN:  Your Honor, we can give you an update on

6   discovery and other matters if The Court would like that.

7          THE COURT:  If there's a need to take up those issues,

8   I'm certainly glad to do so.  If there's no dispute and you-all

9   are proceeding along sticking to the trial schedule, I don't

10  know that there's any need to take those matters up today.

11         MS. BERNSTEIN:  I think we're in good shape.  We've been

12  continuing to confer to try to identify issues and resolve them

13  so that we can flag any narrow issues for The Court.

14         THE COURT:  Counsel for Defendants, same question,

15  anything in the closed session or the open session and I will go

16  around to each attorney, Ms. Copeland?

17         MS. COPELAND:  No, Your Honor.

18         THE COURT:  Mr. Balbo?

19         MR. BALBO:  No, Your Honor.

20         THE COURT:  Mr. Theodocion?

21         MR. THEODOCION:  No, sir.

22         THE COURT:  Well, I will take all of these matters under

23  advisement.  I will issue a written ruling on the pending

24  motions.

25         That will conclude our hearing today and we will be

83

1    adjourned.

2            (Proceeding concluded at 12:22 p.m.)

3

4                          CERTIFICATION

5

6        I certify that the foregoing is a true and correct

7    transcript of the stenographic record of the above-mentioned

8    matter.

9

10

12   _____        10/02/2022

13   Debra Gilbert, Court Reporter           Date

14

15

16

17

18

19

20

21

22

23

24

25